UNITED STATES GYPSUM COMPANY, Plaintiff-Appellant and Cross-Appellee, v. ADMIRAL INSURANCE COMPANY *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division) No. 1—91—0523

Opinion filed November 4, 1994.—Rehearing denied January 9, 1995.

Stephen C. Neal and Stephanie A. Scharf, both of Kirkland & Ellis, Marion B. Adler, of Hedlund & Hanley, and Arthur G. Leisten, Stanley L. Ferguson, and Christopher J. McElroy, all of United States Gypsum Company, all of Chicago, for appellant.

John R. Brandenburg, of John R. Brandenburg & Associates, Ltd., David C. McLauchlan, Hugh C. Griffin, Mark A. Kreger, and Robert P. Arnold, all of Lord, Bissell & Brook, Michael Dockterman and Dawn Canty, both of Wildman, Harrold, Allen & Dixon, D. Kendall Griffith, Nancy G. Lischer, Robert E. Nord, and Vito M. Masciopinto, all of Hinshaw & Culbertson, Terrence E. Kiwala, of Rooks, Pitts & Poust, Katherine E. Rakowsky, of Grippo & Elden, Thomas F. Poelking and Thomas J. Andrews, both of Johnson & Bell, Ltd., Donald V. Jernberg and Elaynne B. Cothran, both of Oppenheimer, Wolff & Donnelly, Tressler, Soderstrom, Maloney & Priess, and Bates, Meckler, Bulger & Tilson, all of Chicago, William J. Cassidy and L. Anthony Sutin, both of Hogan & Hartson, of Washington, D.C., Wilson M. Brown III and Lawrence Nathanson, both of Drinker, Biddle & Reath, of Philadelphia, Pennsylvania, and Jerry S. Sallee and Gregory A. Harrison, both of Dinsmore & Shohl, of Cincinnati, Ohio, for appellees.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, of counsel), for *amicus curiae*.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff United States Gypsum Company (Gypsum), as insured, filed a declaratory judgment action against defendants seeking insurance coverage under certain policies issued between the 1930s and 1984 for actions filed against it involving liability relating to Gypsum's manufacture of asbestos-containing building materials (ACBMs). In the underlying actions alleging property damage that are the subject of this appeal, the property owners alleged that ACBMs manufactured by Gypsum caused damage to their buildings and other properties.

The circuit court entered partial summary judgment in favor of Gypsum finding that all the primary insurers owed Gypsum a duty to defend the underlying actions. The trial court also determined that a number of excess carriers, Admiral, American Re-Insurance, Interstate and Continental (CNA), First State, and Fireman's Fund, did not owe Gypsum a duty to defend and subsequently entered an order of partial summary judgment in their favor on that issue. In another order granting partial summary judgment entered on January 8, 1990, the trial court ruled that Gypsum would be required

to exhaust all available primary insurance coverage before seeking coverage under excess insurance policies.

A bench trial was subsequently held to determine whether the defendant carriers had a duty to indemnify Gypsum in eight of the underlying cases that had been settled or tried to verdict. The trial court determined that these eight underlying claims involved "property damage" as defined in the policies and that none of the exclusions contained in the policies were applicable to bar coverage. The court applied a "discovery trigger," determining that the date the ACBMs were discovered in the structures of the underlying plaintiffs was the critical event that invoked coverage. Consequently, the duty to indemnify only fell upon those policies in effect at the time of such discovery. In addition, the trial court determined "[f]or purposes of interpreting the deductible limits of certain primary policies, the number of occurrences is determined by reference to the event for which U.S. Gypsum actually incurs liability. This Court hereby marks liability in all underlying cases by the claimant's first discovery of U.S. Gypsum's asbestos-containing products in its building. Each first discovery, therefore, constituted a separate occurrence for purposes of deductibles and limits."

Gypsum filed this appeal. It challenges the trial court's use of a discovery trigger and the trial court's interpretation of the "per occurrence" provisions pertaining to the calculation of deductibles. Gypsum also appeals a portion of the partial summary judgment order of January 8, 1990, entered in favor of excess insurers, alleging that the trial court erred in ruling that it had to exhaust all available primary coverage prior to seeking coverage under excess insurance policies.

Defendants filed a cross-appeal from the trial court's finding that a duty to indemnify existed. They argue that the trial court erred in failing to require Gypsum to prove through "actual facts" that there was "property damage" within the meaning of the policies in each of the underlying cases. Defendants also contend that the trial court erred in concluding that none of the policy exclusions or other limitations contained therein applied to preclude coverage.

FACTS

A. Introduction

In December 1983, United States Gypsum Company (Gypsum) filed this declaratory judgment action against its primary insurers and excess carriers which had issued general liability insurance policies spanning the period from the 1930s through 1984. This action

sought a declaration that defendants were obligated to defend and indemnify Gypsum in over 200 claims for property damage resulting from the installation of various ACBMs manufactured by Gypsum, primarily acoustical finishing plaster. The underlying actions sought to recover from Gypsum both the cost of removing the ACBMs from the structures and the cost of repairing the damage which the material caused. Gypsum's declaratory action also encompassed certain underlying actions which sought damage for bodily injury as the result of exposure to asbestos. As noted below, the portion of Gypsum's declaratory action arising from these underlying bodily injury claims was severed for purposes of trial and is not involved in this appeal.

B. Language of the Policies

The specific coverage language for property damage claims may vary from policy to policy; however, the basic coverage provisions and exclusions are substantially the same and can be categorized into two groups. Generally, those primary policies which were issued to Gypsum prior to 1961 and the excess policies issued before 1959 were "accident policies." The relevant coverage provision in these policies generally provides that the insurer agrees to

> "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

The remaining primary policies issued after 1961 and excess policies issued after 1959 are generally "occurrence policies." The relevant basic coverage provision of the primary policies of this period provides that the insurer agrees to

> "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages *** because of *** property damage to which this policy applies, caused by an occurrence."

Generally, these occurrence policies contained a provision stating either that the "policy applies only to occurrences which take place during the policy period" or promising to provide coverage for "property damage *** caused by an occurrence which takes place during the policy period."

An example of one of the basic provisions of an excess policy for this period is contained in the policy issued by defendant American Motorists Insurance Co. (AMICO), which provides:

> "The company agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damage, direct

or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability *** imposed upon the insured by law *** because of *** property damage *** caused by or arising out of an occurrence which takes place during the policy period anywhere in the world."

Although "occurrence" and "property damage" are not defined uniformly throughout all of the policies, the various definitions provided in the policies reflect substantial similarity. "Occurrence" as used in the later primary and excess policies is generally defined as "[a]n accident, including a continuous or repeated exposure to conditions, which results, during the policy period, *** in property damage. *** neither expected nor intended from the standpoint of the insured."[1]

Each policy also contains a provision insuring against physical injury to tangible property. In policies issued prior to 1972, "property damage" was generally defined as "injury to or destruction of tangible property, including the loss of use thereof."[2] In policies issued after 1972, property damage was defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically

[1]This language is contained in the AMICO umbrella policies (1972-75), and the follow-form excess policies of AMICO (1972-75), Continental (1972-75), Fireman's Fund (1972-75), and First State (1972-75). Other policies use the word "accident" rather than "occurrence" (see, e.g., London Market policies), but this difference in language is not considered dispositive by the parties. Other policies contain language such as "sudden or continuous or repeated exposure to any condition resulting in such injury or destruction during the policy period" (AMICO primary policy (1961-63), and follow-up form policies of American Re-Insurance (1966-69) and Continental (1962-69)).

[2]Other pre-1972 language examples include: "injury to or destruction of property, including the loss of use thereof" (AMICO (1961-63), Continental Casualty (1962-69), and American Re-Insurance Co. (1966-69)); "damage to property accidentally sustained" (London Market excess (1949-53)); "damage to or destruction of property of others" (London Market excess (1953-61)); "damage to or destruction of property" (London Market umbrella (1958-62)); "loss of or direct damage to or destruction of tangible property" (National American umbrella (1961-63); follow-form excess policies American Excess (1979-80); London Market defendants (1976-79), Interstate (1979-80), and National Surety (1975-80)); and "loss of or direct damage to or destruction of real or personal property including consequential losses to tangible or intangible property directly resulting therefrom" (London Market (1966-72); follow form excess Continental (1969-72), Fireman's Fund (1969-72), and certain London Market defendants (1966-72)).

injured or destroyed provided such loss of use is caused by an occurrence during the policy period."[3]

Most policies also contained "work product" or "own product" exclusions. Some of these exclusions provided that the insurance did not extend coverage "to injury to or destruction of *** any goods or products manufactured, sold, handled or distributed by the named insured, or work completed by or for the named insured, out of which the accident arises." Other policy exclusions provided that coverage did not extend to

"property damage to *** the named insured's products *** arising out of such products or any part of such products ***; to property damage to *** work performed by or on behalf of the .named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."

Certain excess policies contained "repair or replacement" exclusions. Typically, as in the policies issued by defendant London Market and defendant National American, under these provisions, coverage did not extend to claims made against the insured:

"(i) for repairing or replacing any defective product or products manufactured, sold, handled or distributed by the insured or any defective part or parts thereof nor the cost of such repair or replacement;

(ii) for the loss of use of any such product or products or part or parts thereof;

(iii) for improper or inadequate performance, design or specification, but nothing herein contained shall be construed to exclude claims made against the insured for personal injuries or property damage (other than property damage to a product of the insured) resulting from improper or inadequate performance, design or specification."

C. Relevant Procedural History

In 1985, the trial court severed the portion of the declaratory judgment action that sought recovery based on underlying bodily injury claims from that portion based on underlying property damage claims. The trial court then proceeded with those issues relating to coverage for property damage claims only.

---

[3]This language is contained in the umbrella policy of AMICO (1972-75) and follow-form policies of Admiral (1980-84), American Excess (1978-79, 1980-82), Continental Casualty (1972-75), Fireman's Fund (1972-75), First State (1972-75/1980-84), and National Surety (1980-84). The primary policy issued by AMICO covering the years 1972-75 has a three-prong definition including "an injury to or destruction of tangible personal property."

These proceedings relating to coverage for the underlying property damage cases were conducted in three separate phases. The first two phases involved collateral issues that were either settled or resolved without an appeal being taken. They do not concern or relate to the matters at issue in this appeal.

The issues which remained for determination in the third phase involved the duty of the various defendants to defend and indemnify Gypsum for its liability incurred in the underlying property damage cases. The trial court resolved the duty to defend issues by granting partial summary judgment in favor of Gypsum with respect to all primary insurers and certain excess carriers, finding that they owed Gypsum a duty to defend against the claims of the underlying property owners. The trial court also determined that some of the excess policies, those issued by Admiral, American Re-Insurance, Interstate, CNA, First State, and Fireman's Fund, did not impose a duty to defend, and in those cases the trial court granted partial summary judgment in favor of the carriers. No appeal was taken from these summary judgment orders, and consequently, the issues pertaining to the duty to defend are not before us on appeal.

On January 8, 1990, the trial court entered an order of partial summary judgment in which it ruled that Gypsum was required to exhaust all available primary coverage that was triggered before seeking coverage under the excess policies. This left open the issues relating to defendants' duty to indemnify and the concomitant question as to the appropriate coverage trigger. These issues were resolved after a six-month bench trial in 1990 and 1991.

Of the approximately 250 underlying property damage cases filed against Gypsum, Gypsum tried 16 cases to verdict and received adverse verdicts in seven of those cases. Gypsum also settled 29 other cases. About 200 cases remain pending. By agreement among the parties, this coverage trial was limited to eight specific underlying cases, seven of which Gypsum had settled and one of which Gypsum tried to an adverse verdict.

The earliest installation of Gypsum's products in any of these eight underlying cases occurred in 1937. Installation continued at various points until the 1970s. Generally, the presence of asbestos in the building materials was discovered by the respective owners sometime between 1978 and 1985. These eight cases which involved a total of 53 buildings, 47 of them schools, and their underlying dispositions are as follows: (1) Lexington, South Carolina[4] —settled

---

[4]*Lexington County School District Five v. U.S. Gypsum Co.* (D.S.C.), 82—

for $675,000; (2) Enterprise, Alabama[5] —settled for $100,000; (3) Huntsville, Alabama[6] —settled for $1.36 million; (4) Collier County, Florida[7] —settled for $40,000; (5) Orangeburg County, South Carolina[8] —settled for $17,500; (6) Washington County, Tennessee[9] —settled for $180,000; (7) Consolidated Columbia, Missouri[10] cases—settled for $3.8 million; and (8) Independence, Missouri[11] —verdict including cost and interest of $757,168. The coverage and indemnification issues concerning the remaining underlying cases were stayed by the trial court. In each of the underlying eight cases, asbestos-containing materials were installed in the ceilings of certain buildings. These materials, consisting primarily of ceiling finishing plaster, were removed and replaced with safer materials. The articulated reasons for removing the asbestos varied among the cases, but generally the actions were taken in order to eliminate a perceived health hazard.

Issues specific to the reasonableness of the settlement reached in the Lexington case have been raised here on appeal. In the Lexington case, the complaint alleged property damage resulting from the installation of asbestos products in Irmo High School. That complaint also alleged that U.S. Gypsum acted fraudulently and conspired with others to prevent the disclosure of medical and scientific data on the health hazards of asbestos. The Lexington plaintiff sought $360,000 for the cost of removal and abatement of asbestos and also sought an unspecified amount in punitive damages.

During the underlying Lexington trial, the Lexington plaintiff produced evidence that showed it spent $377,053.83 to remove the asbestos from the high school. Defense counsel for Gypsum determined that the trial was not going well and negotiated a settlement of $675,000 with the Lexington plaintiff.

D. Trial Testimony
During the third phase of trial, Gypsum called Richard Hatfield

---

2072—L.

[5]*City of Enterprise v. W.R. Grace Co.*, CV—85—87.

[6]*Huntsville City Board of Education v. National Gypsum Co.*, CV 83—325L.

[7]*Collier County v. U.S. Gypsum Co.*, No. 85—0970—CA—01.

[8]*County of Orangeburg v. W.R. Grace Co.*, No. 86—CP—38—658.

[9]*Washington County v. Wolfe*, No. CV 2—83—329.

[10]*Columbia Public School District v. U.S. Gypsum Co.*, (W.D. Mo.), 87—4366 CV—C.5.

[11]*School District of the City of Independence Missouri, No. 30 v. U.S. Gypsum Co.*, CV. 84—35334.

as its expert. He had served as an asbestos consultant to some of the underlying claimants in the actions brought against Gypsum. Hatfield testified that he had experience in identifying asbestos-containing products, the circumstances under which asbestos-containing materials release fibers, and the mechanisms and frequency of asbestos fiber release.

Hatfield opined that asbestos fibers could become dislodged from ACBMs in a number of ways, including age deterioration, water damage, routine building activities, and air currents and vibrations from the building's ventilation system. In support of his conclusions regarding the air currents and vibrations, Hatfield cited a study which he conducted in a wind tunnel experiment. Hatfield also said that ordinary activities, such as sweeping, dusting, or cleaning, caused "reentrainment" of fibers. "Reentrainment" occurs when a previously released fiber is again made airborne. According to Hatfield, this reentrainment of fibers repeatedly causes contamination.

On cross-examination, Hatfield admitted that he had not performed any tests or conducted any studies to prove that asbestos fibers would be released through age deterioration, water damage and routine building activities. He agreed that he had no post-graduate degree and that his undergraduate degree was in statistics and geology. He conceded that his background did not meet the Environmental Protection Agency's (EPA's) recommended criteria for asbestos consultants. Hatfield could not identify any scientific studies which supported his opinions on the susceptibility of different asbestos-containing materials to fiber release, the binding strength of the components used in the particular products at issue, or the effect of different forces on fiber releasability.

At trial, Gypsum also introduced trial transcripts and depositions from the underlying cases in which witnesses recounted their observations as to the presence and condition of ACBMs in the buildings at issue in the underlying cases. These individuals stated that the products were "friable," meaning that those materials "can release asbestos fibers following only minor disturbance to the material." This material was described as "easy to crush by hand" by an inspector of the Collier County schools, "crumbly" by the superintendent in Huntsville, and "fluffy and highly friable" and "crumb[ling] easily under hand pressure" in the Columbia case.

Gypsum also introduced certain EPA publications that described some ways in which fiber release could occur. That material stated that fiber release can occur from vibrations. Also, certain EPA materials provide that asbestos-containing materials near airstreams are likely to suffer surface erosion and fiber release could result. Wa-

ter damage "can dislodge, delaminate, or disturb friable asbestos-containing materials that are otherwise in good condition and can increase the potential for fiber release by dissolving and washing out the binders in the material." Furthermore, other EPA publications state that "asbestos materials can become hazardous when due to *** deterioration over time, they release fibers into building air." The publications also provide that schools are especially prone to fiber release as they "are usually constructed with low ceilings and the level of user activity is high [and] [m]aterials are often located within the reach of students."

Gypsum introduced evidence with respect to each of the buildings in question that activities occurred which have been determined to be sufficient to cause the release of asbestos fibers. For instance, in Independence there was evidence that balls were thrown against the ceiling and that sticks were pushed into the material. In Columbia, portions of the ceiling were subject to abrasion, and in Huntsville students would walk through fallen ceiling material and beat it into a powder. There was additional evidence that ceilings in other cases had initials carved into them and that there were impact marks on the ceilings. Gypsum offered testimony that the buildings in Independence, Lexington, and Huntsville were mopped and swept daily, and that the light bulbs in the buildings' light fixtures were changed on a regular basis, all of which could inject asbestos fibers into the atmosphere through either reentrainment or fiber release.

There was also testimony that some of the ceilings involved in the Huntsville case had suffered water damage from leakage and that materials were "flaking off or delaminating" in "chunks and fine pieces." With respect to the Collier case, Gypsum offered testimony that there was visible evidence of deterioration, including the presence of a noticeable amount of the asbestos-containing materials on work surfaces and within the carpet, as well as evidence of vibrations from a second-floor gymnasium that caused a periodic flaking of the first-floor ceiling.

Gypsum called two witnesses, Thaddeus Snell and Garth Geering, concerning the reasonableness of the Lexington settlement. Thaddeus Snell, who was lead attorney for Gypsum in the Lexington case, pointed out in explaining the decision to settle the Lexington case that Gypsum's opening statement in the Lexington trial was weak compared to that offered by the school district; that expert witnesses were not available to testify on Gypsum's behalf; and that Gypsum's first witness was impeached by interrogatories signed and verified on behalf of U.S. Gypsum. Snell admitted that it was the consensus of the defense lawyers present that there was a likelihood

that Gypsum would face a punitive damage award if the case went to verdict.

Garth Geering, former claim vice-president for the commercial division of Allstate Insurance Co., testified that of the $675,000 paid in the Lexington settlement, $377,053 was reasonably related to the Lexington plaintiff's provable compensatory damages. He testified that in reaching that conclusion he considered that the Lexington jury was to receive an instruction on punitive damages. He refused to offer an opinion that the additional $300,000 paid was reasonable.

Defendants offered expert witness testimony to show that the release of asbestos fibers from Gypsum's products would be minimal and would not result in property damage. Dr. Gordon Bragg, a professor of mechanical engineering, testified that asbestos is a "naturally occurring mineral" which is released into the atmosphere in dust or particle form in various ways including erosion, mining, manufacturing and demolition.

Bragg stated that in order for asbestos fibers to be released from the ACBMs, an external force must act upon the cement-like plaster matrix. That force must be strong enough to separate the fibers from the larger particles of dust or debris and then disperse the fibers away from the plaster. Bragg concluded that such forceful disturbances are rare. He said that even if asbestos fibers were released and became airborne, the building's ventilation system would quickly dilute the affected air and replace the contaminated air.

According to Dr. Bragg, the only scientifically accepted method of determining the existence and extent of airborne asbestos fibers is by the taking of air samples. Dr. Bragg stated that the settled-dust method of collecting samples was not sound. He asserted that dust samples cannot measure the size of fibers in the air or the amount of time it took the dust to collect on the surface. Bragg stated that dust samples taken from new carpeting and from new buildings which do not contain any asbestos-containing materials have fiber levels higher than those found by Mr. Hatfield in the underlying cases.

Dr. Bragg testified that age deterioration, water damage, airstream or vibrations, and normal building activities such as changing a light bulb would not be sufficient to release asbestos fibers from the host material. Moreover, according to Dr. Bragg, there was no evidence that "reentrainment" took place with respect to asbestos fibers. Bragg stated that studies reveal that the forces which hold microscopic particles to solid surfaces prevent loose asbestos from being reentrained into the air. Dr. Bragg opined that the amount of asbestos fibers on solid surfaces inside buildings which could be reentrained is too minimal to be measurable.

Roger Morse, an architect, testified in agreement with Dr. Bragg that a great deal of external force must be used to release fibers from a hardened plaster matrix. Morse also concurred with Bragg's conclusions that asbestos fibers would not be released from the plaster through the normal course of events. He added that the speed of air normally found in the ventilation systems of most buildings would be insufficient to dislodge asbestos fibers from ACBMs. With respect to vibrations, Morse concluded that a building which produced or suffered vibrations strong enough to result in asbestos fiber release would be uninhabitable because it would be too unstable to occupy.

Dr. Jack Peterson, an industrial hygienist, testified that people are exposed to asbestos on a daily basis. Petersen said that it is generally accepted that asbestos fibers can present a risk of harm only if the fibers are airborne and respirable. He testified that studies have shown that many asbestos particles do not remain airborne but instead fall to the floor or affix themselves on ceilings, walls or other fixtures.

Petersen pointed to the regulations governing the level of asbestos in the work place which are promulgated by the Occupational Safety and Health Administration (OSHA). (See, e.g., 29 C.F.R. § 1910.1101 (1989); 29 C.F.R. § 1926.58 (1990).) According to Petersen, OSHA has established the permissible asbestos fiber level at .2 asbestos fibers per cubic centimeter of air on a time-weighted basis. This time-weighted average is based on a 40-year working life comprised of 50-week years and 40-hour weeks. These regulations define asbestos fibers as having a length which exceeds five microns and a length-to-width ratio of 3:1. According to Petersen, the EPA generally determines the acceptable level of asbestos exposure in nonoccupational settings by extrapolating from the levels established for the work place.

Dr. David Cugall, a specialist in pulmonary medicine, testified that the EPA conducted a study of indoor air in 37 buildings containing damaged ACBMs. The average airborne asbestos level was .0007 fibers per cubic centimeter. Dr. Cugall stated that the air in public buildings generally contains no more than .001 fibers per cubic centimeter.

According to Dr. Cugall, fibers that may be airborne will be respirable only if they are of the size to be inhaled and retained in the lungs of an individual. He testified that the human body's natural mechanisms, including the lungs, will protect it from microscopic particles including the type of asbestos fibers that were incorporated into Gypsum's products. Dr. Cugall said that he was not aware of any reported case where a patient's asbestosis or lung cancer was attrib-

uted to the occupancy of a building with ceiling plasters containing asbestos. According to Dr. Cugall, the type of asbestos used in Gypsum's acoustical plaster products, chrysolite, does not cause asbestosis, lung cancer or malignant mesothelioma when present at nonoccupational levels in office buildings and schools.

Defendants also called Dr. Koehn, an economist, and Mr. Dorchester, a real estate appraiser, who testified about the diminution in the value of the buildings in which ACBMs were installed. Dr. Koehn testified that he performed various studies from which he concluded the presence of asbestos does not affect the market value of commercial buildings, and that the presence of asbestos only began to affect the market value of school buildings in 1985. Dorchester opined that, based on a literature study and an investor survey which he conducted, the market value of the property in question was not affected until the mid-1980s.

### E. Findings of the Trial Court

At the conclusion of the third phase of trial, the trial court found that defendants owed a duty to indemnify Gypsum with respect to all eight of the underlying property damage actions at issue. The court held that "Gypsum proved, by a preponderance of the evidence, that the underlying cases each involved allegations of and evidence from underlying claimants of actual physical damage caused by its products to other property, the building and building contents."

The trial court specifically concluded that there was property damage in the underlying cases which triggered coverage under the applicable policies. It stated:

"I find that each of the underlying cases at issue in this proceeding involved property damage so as to entitle U.S. Gypsum to indemnification under the policies at issue in this case.

\* \* \*

I also find that there is, or was, both in general and with respect to the cases specifically at issue, \*\*\* evidence that asbestos-containing building materials release asbestos fibers due to accidental and deliberate contact, abrasion, damage and deterioration, that asbestos fibers so released contaminate buildings and their contents, including drapes, carpets, tables, shelves, and the like, both directly and through that type of release."

In arriving at this determination, the trial court stated that it considered "the complaints, other pleadings and judicial rulings from the underlying cases, discovery that was developed in underlying cases, evidence from the trial, if any, of the underlying cases, such other evidence as those parties chose to introduce in these proceed-

ings, including evidence regarding underlying liability issues, and how the settlements were apparently arrived at." The trial court stated that in order to determine whether U.S. Gypsum would be entitled to indemnification, it would consider whether the jury in any underlying case either found, or U.S. Gypsum reasonably believed the jury would be likely to find, that U.S. Gypsum's asbestos-containing materials caused tortious property damage to the underlying plaintiffs' property.

The court further concluded that "the evidence supports the theory that actual physical damage occurred over an extended period of time." The court found that once asbestos fibers are released they will settle on horizontal surfaces where they are subject to further disturbance (dusting, air traffic, sweeping, etc.) and reentrainment into the air which results in the fibers being resuspended into the air.

The trial court rejected defendants' contention that policy exclusions barred coverage. It determined that the insurers failed to meet their burden of proving that all or any specific part of any judgment or settlement was attributable to amounts excluded by the business risk exclusion.

In determining which policies provided coverage for which underlying claims, the trial court applied a "discovery trigger." Under this approach, coverage was triggered under the particular policies that were in effect at the time the underlying claimant first discovered the presence of ACBMs. The court specifically concluded that the discovery trigger was appropriate because property damage did not occur until the presence of asbestos became known. It stated that "[t]his concept was proven to the satisfaction of this Court by the Defendants' economic experts *** who established that the function and use of a building are unaffected until the recognition that asbestos containing products contained therein are, or are perceived to be, harmful." The trial court concluded that the actual release of asbestos particles "relate[s] only to the danger of personal injury and has no effect on the value of the property prior to discovery [and that t]here was no impairment of use, decrease in market value or cost to the class in the 1960s."

The trial court rejected Gypsum's contention that all of the underlying claims constituted a single occurrence per policy period for purposes of calculating "per occurrence" deductibles and limits. It concluded that each discovery constituted a separate occurrence for this purpose, as well as acting as the trigger of coverage, under the terms of the policy.

The trial court also found that under Illinois law, the insurers as

privies of Gypsum were bound by the adverse liability verdict in Independence. Furthermore, it held that the insurers may not litigate the facts that bear on Gypsum's actual liability in settled cases, but that Gypsum only need prove that it was responding to a reasonable anticipation of personal liability when it settled the cases.

The trial court examined the settlements and found that five of the seven settlements entered into between Gypsum and the underlying plaintiff property owners, including the Lexington settlement, were reasonable and that the reasonableness of the settlements was supported by the record. The trial court found that the Huntsville and Enterprise settlements were not predicated solely upon Gypsum's potential liability for compensatory damages, but were enhanced to reflect "discovery violations and other behavior that U.S. Gypsum was sanctioned for." The court concluded that "[s]ince the extent to which the settlements in each of these cases were punitive, and therefore not an insurable event, cannot be easily ascertained, this Court believes that reasonably only 50 percent of the amounts actually paid should be indemnified in those cases."

In the court's decision of January 14, 1991, the court included Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) language that there was no just reason to delay appeal or enforcement of (1) orders entered on various summary judgment motions and (2) the findings of fact and conclusions of law entered after the trial on the issues of indemnification. Gypsum filed this appeal and defendants cross-appeal.

OPINION

On appeal Gypsum challenges the trial court's use of a discovery trigger and the trial court's determination that there were multiple occurrences for purposes of calculating the deductible limits under certain policies. Gypsum also appeals a portion of the January 8, 1990, order granting partial summary judgment which held that all available primary coverage had to be exhausted before certain excess insurers' obligations became due.

In their cross-appeal, defendants challenge the trial court's finding that a duty to indemnify exists on the grounds that the trial court failed to require that Gypsum offer proof by "actual facts" at trial that there was a sufficient concentration of released asbestos fibers, i.e., that the fibers existed at an "unacceptably dangerous" level, to constitute physical property damage within the terms of the insurance policies. Defendants also argue that certain policy exclusions, including the "own product" and "repair and replacement" exclusions, apply to preclude coverage. As those issues raised

by Gypsum's appeal would only become viable upon a determination that a duty to indemnify exists, we will first address the issues raised in defendants' cross-appeal.

CROSS-APPEAL

A. Duty of Indemnification

Defendants' first contention with respect to the trial court's finding that a duty to indemnify exists is that the trial court applied the wrong standard of proof in the coverage action. Defendants contend that in order to obtain coverage Gypsum was required to prove that each of the underlying cases involved property damage within the meaning of the terms of the policies. Specifically, defendants argue that in order to show "property damage" within the meaning of the policies, Gypsum must show that there was a release of asbestos fibers in each of the underlying cases that resulted in "unreasonably dangerous levels" of released airborne asbestos fibers.

In response, Gypsum argues that it need not offer *de novo* proof that there was a release of asbestos fibers which rose to a certain level of contamination resulting in "property damage" in each of the eight underlying cases. Gypsum contends that to require this type of proof would force it to unnecessarily prove its own liability in each of the underlying cases when that factor has been established by its settlement with the underlying plaintiffs in seven of the cases and the entry of judgment after verdict with respect to the Independence case. Gypsum asserts that to require this level of proof would place it in the untenable position of attempting to prove that the release of asbestos fibers did not result in property damage in the underlying action and then having to turn around and prove the exact opposite position in the coverage action.

■ We first note that if defendants were correct in their contention that Gypsum was required to prove *de novo* that there was contamination resulting from a release of asbestos fibers in each one of the underlying cases, the record below supports the trial court's finding that such damage existed in each of the underlying actions.

In attacking the trial court's finding that property damage existed, the defendants assert that in order to establish that there was property damage, Gypsum was required to show that there was a certain level of released airborne asbestos fibers which were of a respirable size. They contend that only those fibers which are airborne pose a danger and that fibers which were released, but have since settled, and those fibers which have not yet been released should

not be considered in determining whether that level of contamination has been met. In this respect, defendants argue that the finding of damage cannot be predicted on the potential risk of future damage, whether by the additional release of fibers from the ceiling plaster or from the reentrainment of previously released fibers.

The scope of defendants' definition of what constitutes asbestos contamination is too narrow and should not be confined to those fibers which are airborne. (See *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926.) Although the airborne fibers offer the greatest risk of inhalation and subsequent bodily injury, the presence of other nonairborne fibers should not be disregarded. Strong argument can be made that in determining the occurrence of property damage we are free to consider the risk of fibers that have not yet been released but which are certain to be released through age, deterioration, and the course of repeated activities and contact. It would also not be unreasonable to determine that property damage is present once the likelihood of future fiber release is established necessitating immediate remedial action. (See *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1993), 20 Cal. App. 4th 296, 26 Cal. Rptr. 2d 35, *review granted* (1994), 25 Cal. App. 4th 1316; *City of Wichita v. United States Gypsum Co.* (D. Kan. 1993), 828 F. Supp. 851, 864.) However, we need not reach that determination here since there was sufficient evidence, direct as well as inferential, to support a finding that in each of the underlying cases there was an actual release of fibers which either remained airborne or may have resettled and thereby became subject to reentrainment.

Arguably, contamination may be said to occur by the mere presence of asbestos-containing material which presents a risk of future fiber release either because it is friable or because of other anticipated external forces which would interact with it in the normal courses. However, more certainly such contamination may be deemed to have occurred where there is evidence of ongoing release of fibers which either remain airborne or which are resettled in other places and are subject to reentrainment. (See *Armstrong World Industries,* 26 Cal. Rptr. 2d at 84.) We note that, although disputed by defendants, there was sufficient evidence presented here that resettled fibers pose a danger because they could become reentrained into the air at some later point. Likewise, there was sufficient evidence presented by Gypsum which established that fibers are released from friable asbestos-containing materials on a continuing basis through age deterioration and in the course of certain routine activities and events.

Defendants argue that under the decisions of the Illinois Supreme Court in *United States Fidelity & Guaranty Co. v. Wilkin* and *Board of Education v. A,C&S, Inc.* (1989), 131 Ill. 2d 428, 546 N.E.2d 580, Gypsum was required to prove that the released respirable asbestos fibers existed at "unreasonably dangerous levels."

Both *Wilkin* and *Board of Education* recognize that the installation of asbestos-containing materials and the resulting release of fibers can constitute a cognizable claim for property damage. Neither case, however, specifically establishes any requirements with respect to what an insured must prove in order to secure coverage for underlying property damage claims that are based on the installation of asbestos.

The use of the term "unreasonably dangerous" apparently had its origins in *Board of Education*, which was a strict products liability case. We do not, however, think that the use of a strict products liability term in a products liability case signals that that is the proper standard in a coverage action where an insured is seeking a determination of whether a duty of indemnification exists in an asbestos case.

■ Here, although the trial court did not make a specific finding with respect to the level of contamination, its holding indicates that it found the underlying buildings were contaminated by the release of asbestos fibers. The trial court specifically stated that "I find that each of the underlying cases at issue in this proceeding involved property damage so as to entitle U.S. Gypsum to indemnification under the policies at issue in this case. I also find that *there is, or was, both in general and with respect to the cases specifically at issue,* *** evidence that asbestos-containing building materials release asbestos fibers due to accidental and deliberate contact, abrasion, damage and deterioration, that asbestos fibers so released contaminate buildings and their contents, including drapes, carpets, tables, shelves and the like, both directly and through that type of release." (Emphasis added.)

Throughout their briefs, defendants argue that Gypsum offered "no credible evidence" of property damage within the meaning of the policies. They contend that the scientific evidence which they offered showed that the levels of airborne asbestos fibers were not unreasonably dangerous and were within the standards generally established under OSHA, that the fibers were not released from the cement-like nature of the plaster except in rare instances of a directed and powerful force, that released fibers did not become reentrained, and that many released fibers were not of respirable size and many would be washed out by the buildings' ventilation systems.

■ To the extent that this argument challenges the trial court's factual findings that property damage exists, it must be rejected. As a reviewing court, we are bound by the trial court's factual findings unless they are against the manifest weight of the evidence. (*Zurich Insurance v. Raymark Industries, Inc.* (1986), 145 Ill. App. 3d 175, 494 N.E.2d 634, *aff'd* (1987), 118 Ill. 2d 23, 514 N.E.2d 150.) Here, although defendants offered considerable expert testimony that the amount and type of airborne respirable fibers found in the underlying cases were insufficient to constitute any health risk and that there was no danger from reentrainment, the trial court was presented with evidence which supported Gypsum's claim that each of the underlying cases involved property damage within the meaning of the policy.

First, Hatfield's testimony established that asbestos fiber release can occur as the result of several different conditions or events. These conditions or events included age deterioration, water damage, physical injury, vibrations, air currents, and routine maintenance activities. Hatfield testified that these activities could lead to asbestos concentrations far in excess of .2, the level established by OSHA for workers in the asbestos field. Hatfield also said that there was no way to tell when the fibers were released and that the rate for fiber dispersal is continuous and long-lived.

Hatfield confirmed that, once released, these fibers will settle in a variety of places including on work surfaces, in carpeting, drapery and certain types of furniture. According to Hatfield, these settled fibers would then be reentrained by certain activities, particularly cleaning activities such as sweeping, dry mopping and vacuuming. Once reentrained, he explained, these fibers present the same danger as newly released asbestos fibers.

Defendants contend that Hatfield's testimony lacks a scientific basis. We disagree. Hatfield's testimony was supported in all of the abovementioned respects by authoritative EPA publications dealing with the dangers of asbestos, particularly the Orange Book, which confirmed Hatfield's conclusions concerning fiber release, reentrainment and the level of toxicity of asbestos fibers. In addition to support from these materials, Hatfield could draw on his experience from participating in research and studies dealing with asbestos materials and the results of exposure to asbestos.

Defendants point to Hatfield's lack of a post-graduate education and published papers on the subject of fiber release. Although Hatfield possessed only a B.A., he has significant experience in this field from consulting and advising property owners who have ACBMs installed in their buildings. (*Yates v. Chicago National League Ball*

*Club, Inc.* (1992), 230 Ill. App. 3d 472, 595 N.E.2d 570.) This experience included examining different structures containing ACBMs, evaluating the potential risk posed by the ACBMs and recommending various courses of action—the precise actions to which he testified at trial. In this respect we note that Hatfield was engaged by the building owners in most of the underlying actions to testify against Gypsum and that he was an expert witness in the Independence case.

Here, Hatfield's testimony at the coverage trial, as well as in the depositions and transcripts of the underlying actions to be discussed later, indicated that the release of asbestos fibers created a potential health hazard and that there were sufficient levels of contamination present to support a finding that Gypsum settled the cases with reasonable anticipation of liability.

Hatfield testified that while the mere presence of undisturbed intact asbestos did not pose a health hazard, a concern arises when the material is disturbed and fibers released, thus exposing workers and occupants to the dangers of asbestos. He read from a 1988 EPA publication that "[s]everal life threatening diseases, such as lung cancer and mesothelioma can be caused by exposure to airborne asbestos. No safe threshold has been established for asbestos." He also read: "Available information indicates that combined epidemiological and animal evidence failed to establish conclusively differences in mesothelioma hazards for various types of asbestos fibers. In view of the inconsistencies and uncertainty regarding this issue, the EPA believes that it is prudent in the public interest to consider all fiber types as having comparative carcinogen potency in its quantitative assessment of mesothelioma risk."

Likewise, the EPA publication, Asbestos Containing Materials in School Buildings: A Guidance Document (March 1979), provides that the "EPA and the scientific community believe that any exposure to asbestos involves some health risk. No safe level of exposure (or threshold level of exposure) has been established. Further, it is impossible at this time to confidently estimate the exact degree of risk associated with low-level exposures." The EPA publication also cautions that school populations are susceptible to exposure because the students are active and a large number of students can be exposed at one time.

In addition to this evidence that the precise level of asbestos which poses a health hazard is uncertain, Gypsum introduced evidence that "[c]ontamination can be readily assumed in the presence of highly friable material of high asbestos content in poor condition, visual debris ***, regardless of existing airborne levels." The three most important determinants of contamination are the type of mate-

rial, its accessibility and its condition. Although we will discuss this issue later when we analyze the evidence offered in the underlying cases, we note at this juncture that each of the underlying cases described ACBMs in poor condition and that in each case there was evidence of visible debris. See also Guidance for Controlling Friable Asbestos Containing Materials in Buildings, at 3—8 ("Substantial fiber release apparently can occur in damaged or deteriorating materials even where the asbestos is low").

An alternate source of determining that contamination was present would be the testimony which recommended that the ACBMs in question be removed. Hatfield testified that, in certain instances, an operation and maintenance program could be considered appropriate. Hatfield testified that in other cases, like those before us here, removal of the contaminating asbestos is really the only solution. He stated that asbestos should be removed when the materials exist in such a condition that they demonstrate damage or deterioration, particularly water damage. He stated that encapsulation is not effective to prevent physical injuries because the protective coating can be damaged by students or other occupants as well as by water leakage. As such, we conclude that there was a sufficient factual basis for the trial court's finding that property damage was present in each of the underlying cases.

However, regardless of the sufficiency of the *de novo* proof presented by Gypsum in the coverage trial, Gypsum as an insured seeking coverage would not be required to establish its own liability in the underlying actions by independent proof.

■ We note at this juncture that the question regarding the sufficiency of Gypsum's evidence of property damage so as to invoke coverage would ordinarily not be confronted here where all primary and one excess carrier were found to have breached their duty to defend. Although this issue for whatever reasons was not seriously pursued by the parties in their briefs and argument, it was established in *Thornton v. Paul* (1979), 74 Ill. 2d 132, 144-45, 384 N.E.2d 335, that "[w]hen the insurer wrongfully refuses to defend a complaint that alleges facts within coverage, it is liable for breach of contract. [Citation.] The measure of damages for such a breach is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred." (See also *St. Paul Fire & Marine Insurance Co. v. Vigilant Insurance Co.* (4th Cir. 1990), 919 F.2d 235 (insurer who breached its duty to defend cannot argue during indemnity portion that the underlying incidents occurred outside its policy period).) As such, courts have held that if an insurer is uncertain as to its duty to defend, it must either seek a declaratory

judgment as to its obligations and rights prior to trial of the underlying action or defend under a reservation of rights or both. (*Insurance Co. v. Protective Insurance Co.* (1992), 227 Ill. App. 3d 360, 592 N.E.2d 117.) If "the insurer does not elect one of these courses of action and refuses to defend an insured who ultimately incurs an adverse judgment, the insurer will be estopped from raising policy exclusions or noncoverage as a defense in any subsequent action brought to recover policy proceeds." *Insurance Co. v. Protective Insurance Co.*, 227 Ill. App. 3d at 365.

However, even if the *Thornton* rule is not applicable (a conclusion not inconsistent with the failure of Gypsum to press this issue on appeal), Gypsum would not be required to offer actual facts showing property damage to be present in the underlying cases. Defendants assert that Gypsum is required to offer "actual facts" showing that property damage was present in each of the underlying cases, *i.e.*, that there was a release of asbestos fibers in each of the underlying cases that resulted in "unreasonably dangerous levels" of such fibers. They argue that the issue of "property damage" was never decided in the seven cases that Gypsum settled and was not specifically addressed in the Independence case that was tried to a verdict.

We first address the situation presented by the Independence case, which went to verdict and judgment. We disagree with the defendants' contention that the issue of property damage was not specifically addressed at the Independence trial. The complaint filed by the underlying plaintiff in Independence alleged that the installation of asbestos-containing products manufactured by Gypsum had made the schools "unsafe, damaged and hazardous *** because of becoming impregnated with asbestos fiber." All of the allegations of the complaint alleged property damage and each one predicated the claim on the presence of asbestos.

Moreover, at the Independence trial there was substantial testimony establishing that the asbestos-containing ceiling material was friable and tests indicated that fibers had been released in the past. Testimony also established that the ceiling material suffered water damage and other physical damage such as marks and abrasions. There was a considerable amount of dust from the ceilings on desks, work surfaces and window sills. Opinion testimony from the plaintiff's expert, Dr. Rohl, confirmed that these factors indicated that ACBMs were releasing asbestos fibers. Workers testified that the changing of light fixtures would disturb ceiling material, causing it to flake off and fall to the floor. The deputy superintendent stated that various encapsulating efforts had been unsuccessful and that removal of the ACBMs was eventually necessary. This testimony,

coupled with that offered at the trial itself, was more than sufficient to support the trial court's determination that there was property damage in the Independence case.

Irrespective of the quantum of proof necessary to establish property damage, Gypsum as an insured in a declaratory action does not have to prove *de novo* the existence of damage in the underlying action, *i.e.*, its own liability. The adverse verdict returned by the jury and subsequent entry of judgment conclusively established Gypsum's liability with respect to the Independence case.

The argument that defendant insurers make here is identical to that made and rejected in *Armstrong World Industries v. Aetna Casualty & Surety* (26 Cal. Rptr. 2d at 85). There, the court distinguished the purpose of a proceeding to determine indemnification and a proceeding to determine liability, stating:

> "At trial, the insurers introduced evidence to show that the mere presence of ACBM is not necessarily injurious: that ACBM's do not spontaneously emit asbestos fibers, nor do releases occur more frequently as the ACBM's deteriorate with age; that left undisturbed, ACBM's pose no health hazard to building occupants; and that even if the ACBM's are occasionally disturbed such that asbestos fibers are released, the fibers are removed quickly by normal air circulation. That evidence, however, has no bearing on the insurance coverage issue before us. Once again, the insurers have failed to distinguish between questions of liability and questions of insurance coverage. Whether ACBM has *actually caused harm* is a question for the underlying building cases, and if the trier-of-fact finds that the mere presence of Armstrong's products does not cause damage, then Armstrong will have no liability and no need for insurance coverage. The posture of the present case is such that for the purposes of determining the separate question of insurance coverage we *assume* that the presence of ACBM is injurious and that Armstrong will be held liable for injuring the buildings. [(Emphasis in original.)] Given that assumption, we conclude that the alleged injury from installation of ACBM qualifies as 'physical injury' *** under the terms of the policies." (Emphasis added.) *Armstrong World Industries v. Casualty & Surety*, 26 Cal. Rptr. 2d at 85.

The challenge by the insurers in a coverage action may therefore not address the issue as to whether the underlying plaintiffs sustained damage for which the insured is liable. That was the subject of the underlying action. The coverage action may only address whether the damage in question falls within the coverage provisions of the policies. The determination as to whether the proven property damage in the underlying action falls within the scope of the coverage

provision is in this case a question of law, not of fact. The question presented is definitional as to what constitutes property damage under the policies which, as previously discussed, was determined by our supreme court in *Wilkin*. The determination to be made in a coverage action which proceeds after the insured's liability has been conclusively determined by the underlying action is whether the *type* of injury claimed is within the policies' ambit of coverage, not whether any damage occurred in the underlying action below. See *Dayton Independence School District v. National Gypsum Co.* (E.D. Tex. 1988), 682 F. Supp. 1403, 1406 ("[i]n determining whether the claim is within coverage, the nature of the third party's *claim* is determinative, and not the actual facts underlying that claim. [Citation.] A policyholder, therefore, does not have to prove its actual liability as a prerequisite to obtaining coverage." (Emphasis in original.)).

We agree with the rationale that to take a contrary position as defendants urge would sanction unnecessarily duplicative proceedings with each determining the same question—the existence of damage in the underlying action. See *Farmers Insurance v. Vagnozzi* (1983), 138 Ariz. 443, 446, 675 P.2d 703, 706. Accord *Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.* (1994), 76 Haw. 277, ___, 875 P.2d 894, 913 ("[t]he insurer will be collaterally estopped from relitigating material factual findings actually or implicitly adjudicated in the underlying suit"); *Bassick Co. v. Mississippi Valley Erection Co.* (1982), 104 Ill. App. 3d 517, 432 N.E.2d 1146. See also Couch on Insurance:

"One who has undertaken to indemnify another against loss arising out of a certain claim and has notice and opportunity to defend an action brought upon such a claim is bound by the judgment entered in such action, and is not entitled, in an action against him for breach of his agreement to indemnify, to secure a retrial of the material facts which have been established by judgment against the person indemnified.

This concept of binding the liability insurer by the judgment against the insured is not an application of the principle of res judicata but is better termed as estoppel by judgment." 18 Couch on Insurance 2d § 74:186, at 1087-88 (M. Rhodes rev. 1983).

Regardless of the particular legal doctrine invoked to reject the attempt to transform a coverage action into a second liability action, the policy considerations which favor prohibiting such actions are the same. If the defendants' position was adopted, two different triers of fact, the one in the underlying action and the one in the coverage action, would hear the same arguments. The insurers could escape

liability if either one of the triers of fact determined that there was no injury present. If the underlying trier of fact determined that there was no injury, Gypsum would not be liable and the insurers would not have to pay. If Gypsum were determined to be liable in the underlying action and the trier of fact in the coverage action determined that no damage was present, then the insurers would escape liability because the policy would not "cover" a situation where there had been no damage.

Moreover, we agree with the rationale that in allowing an insurer to offer proof that no damage occurred would also put the insured defending its own action in a precarious situation. In the underlying action, the insured would offer proof that no property damage occurred. Then in the coverage action, it would be required to offer evidence that property damage did occur. The contrary positions which the insured would be forced to take would make it impossible for the insured to participate in both actions without charges of perjury or the invocation of the doctrine of judicial estoppel which could preclude a party from taking inconsistent positions in separate judicial proceedings. (See *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.* (1994), 259 Ill. App. 3d 836, 635 N.E.2d. 485.) Consequently, we reject defendants' position that Gypsum is required to offer proof on the issue of whether damage occurred in the underlying Independence case as the judgment entered in that case serves as proof of Gypsum's liability.

We next turn to the seven cases which Gypsum settled with the underlying plaintiffs. In cases where a settlement is involved, the additional concern that the settlement was entered into in order to obtain insurance coverage for an otherwise uninsurable claim may arise. There is also a contrary, though not mutually exclusive, concern that an insured will be deterred from entering into a settlement agreement when it would have to offer full proof that property damage existed in the coverage action when that proof has not yet been established in the underlying action.

Courts have addressed these competing concerns by crafting the general rule that if an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in "reasonable anticipation of personal liability." (*WestAmerica Mortgage Co. v. Tri-County Reports, Inc.* (N.D. Ill. 1987), 670 F. Supp. 819.) As the Second Circuit explained in *Luria Brothers & Co. v. Alliance Assurance Co.* (2d Cir. 1986), 780 F.2d 1082, in order to recover a settlement, the

> "insured need not establish actual liability to the party with whom it has settled 'so long as *** a potential liability on the facts known

to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].' " *Luria Brothers & Co.*, 780 F.2d at 1091, quoting *Damanti v. A/S Inger* (2d Cir. 1963), 314 F.2d 395, 397.

The policy considerations favoring such an approach were set forth in *Uniroyal, Inc. v. Home Insurance Co.* (E.D.N.Y. 1988), 707 F. Supp. 1368. There, the court recognized that "settling defendants [would be placed] in the hopelessly untenable position of having to refute liability in the underlying action until the moment of settlement, and then of turning about face to prove liability in the insurance action." (*Uniroyal, Inc. v. Home Insurance Co.*, 707 F. Supp. at 1378.) Moreover, requiring that insureds reprove the entire case which was to be offered against them could have a chilling effect on settlements as "[s]uch a regime would markedly reduce the advantages to the insured of settling: faced with the choice of defending the tort action vigorously or settling it without hope of insurance reimbursement, insureds would tend to choose the former." (*Uniroyal, Inc. v. Home Insurance Co.*, 707 F. Supp. at 1378.) As such, we conclude that Gypsum only need show that it had a reasonable anticipation of liability when it settled the underlying cases.

Like their contention with respect to the Independence case, defendants argue that Gypsum must offer proof of property damage through "actual facts" and not through testimony, evidence or depositions obtained or adduced in the underlying cases which Gypsum settled.

■ Defendants' primary contention is that the evidence from the underlying cases constitutes impermissible hearsay. We agree that there would be a hearsay problem if such evidence were to come in substantively on the issue of whether property damage actually existed in the underlying cases. In this case, however, the evidence from the underlying cases does not go to the ultimate issue of fact that defendants suggest, but rather to whether Gypsum had a reasonable anticipation of liability in the cases which it settled and whether the damage was the type of damage covered by the policy with respect to the Independence case, which was tried to an adverse verdict. (See *Dayton*, 682 F. Supp. at 1409-11; *Armstrong*, 26 Cal. Rptr. 2d at 85.) Basically, the nature of the pleadings, the pretrial discovery, evidence and testimony presented during the trial prior to settlement would be relevant to establish the reasonableness of the insured's anticipation of liability. Such evidence is not hearsay when introduced to establish that it was reasonable for Gypsum to settle in the face of such present or potential testimony and proof. Such evi-

dence is encompassed within the category of utterances and writings offered to show the effect on the hearer or reader which are treated as verbal acts rather than as hearsay. (See M. Graham, Cleary & Graham's, Handbook of Illinois Evidence § 801.5 (5th ed. 1990); E. Cleary, McCormick on Evidence § 249 (3d ed. 1984).) As such, the trial court could properly consider the proof introduced in the underlying action in addition to the direct evidence heard in the coverage trial below.

The determination of whether Gypsum's anticipation of liability was reasonable would naturally turn on the quality and quantity of proof which Gypsum would expect to be offered against it in the underlying action. The depositions from the underlying cases, as well as the trial testimony in those cases settled after the trial had begun, offer the best indication of what evidence Gypsum would expect to have offered against it in the underlying action.

The Columbia case had the most extensive evidence of any of the eight underlying cases. Dust samples indicated a number of locations, particularly the Raytown, N. St. Gabriel Parish, Tillman and Westchester schools, had released fibers greater than .5 um in length, the type of fiber thought to be the most toxic. In addition to those fibers, there were other measurable amounts of shorter asbestos fibers. In a separate deposition in the same case, an expert witness, Dr. Keyes, opined that there was no safe level of asbestos. He explained that to consider the level of released asbestos fibers safe, the level would have to be such that someone could not get lung cancer or some other disease by inhaling the fibers.

Dr. Keyes stated that the air samples in the buildings showed "substantially high" levels of fiber, including a reading of .04 structures per cubic centimeter as compared to ambient levels of .005 structures per cubic centimeter. In one school there was a considerable amount of dust and debris from the ceiling and large holes had been cut into the ceiling so that an HVAC system could be installed. Additional damage was also done to that original ceiling when a suspended ceiling was put in. Dr. Keyes opined that in light of these factors, the ACBMs should be removed as soon as it was practical. He said that any movement of the ceiling tiles could create a substantial hazard by disturbing the fibers. Keyes further stated that he would also recommend the removal of ACBMs in areas, like the East West school, which were continually plagued by water leaks. He stated that removal was urgent in cases where ceiling materials were falling down.

In addition to Dr. Keyes, there were others who recommended the removal of ACBMs in the Columbia case. With respect to the St.

Francis School, there was a recommendation made by Robert Coombs of the Environmental Protection Agency that the asbestos be removed to eliminate a potential health hazard. In support of his decision, Coombs noted that the material crumbled easily, had suffered moderate damage from water and students, and that in certain locations there was an air diffuser blowing directly across the material. The Missouri Department of Health stated that certain water-damaged ceiling materials that contained asbestos had to be removed in Cantwell Elementary because they were severely damaged. Furthermore, Wolfgang Bradner recommended that certain ceilings in the Center School District be replaced because of asbestos contamination.

There was evidence of damage similar to that precipitating the recommendations for removal in other schools involved in the Columbia litigation. Deposition testimony established that there was flaking and cracking of ceiling materials which would fall to the floor in places. In particular, a cafeteria ceiling had periodic flaking because of the vibrations from the gymnasium overhead. The ceilings of the buildings also contained gouging and finger marks from students.

In addition, some of the buildings involved had sustained extensive water damage. For example, a building in the Mobley School District had a severely leaky roof which substantially damaged the interior of the building. At several spots in this building, large trash containers collected water during any kind of rain. Ninety percent of the gymnasium ceiling had indentations and twenty square feet of the ceiling had fallen off in part due to water damage. In the Red Bridge Elementary Center, water-damaged ceiling materials in the classrooms and the corridors would fall to the floor whenever they got wet.

The ceiling material in Red Bridge was so soft and friable that it could not be repaired. Loose material could be seen falling from the gym ceiling during class, especially when it was struck with a ball. The amount of material which would fall would vary with the size of the ball and the force with which it hit the ceiling. The ceilings in the corridors and classrooms were damaged by students who made tracks with their fingers and threw pencils into the material leaving depressions. Likewise, in the Captain School there was friable asbestos on the corridor ceilings which fell from the ceiling in certain spots exposing the bare concrete surface beneath the plaster.

Although the testimony in the Lexington case was not as substantial as that adduced in Columbia, it was more than sufficient to establish that Gypsum could reasonably anticipate a liability

verdict in event of trial. There was trial testimony that the asbestos-containing ceiling materials were like "soft, soft, sand." That material would fall so often and regularly that it would collect on desks and other surfaces overnight. The changing of light bulbs would cause the material to fall over the workmen. Trial testimony also established that the ceiling material would fall to the floor when children would carve their initials into it or when they would damage the ceiling in some other way. There was also evidence of water damage in over 75% of the classrooms.

Bulk samples were taken and an exposure assessment was conducted using an algorithm developed by the EPA which considered a number of factors including, but not limited to: the condition of the material, water damage, accessibility, friability, asbestos content and exposed surface. Based on the range of scores from 36 to 52, with a score of 40 warranting a complete removal of the asbestos, a recommendation was made that the asbestos material be removed in the Lexington case.

Likewise, in Washington County, there was deposition testimony that the ceilings were leaking and had suffered water damage to the point that chunks of the ceiling were falling off. That testimony also established that there were finger marks on the ceiling and that 80% of the area containing asbestos was in reach of students and capable of being further damaged. After an exposure assessment similar to the one involved in the Lexington case was conducted, removal of the ACBMs was recommended. There was also deposition testimony that the school district contacted the EPA and that the EPA recommended removal.

In addition, there was deposition testimony from Dr. Nicholson, who stated that tests for the presence of asbestos involving a damage simulation revealed concentrations of several fibers per milliliter. Dr. Nicholson said that there are a number of episodic peaks of fiber release which occur, from events such as water damage or physical destruction, which release fibers and that the expected level of asbestos depended on the condition of the material.

Similar evidence, although not as extensive or fully textured, was presented in each of the remaining seven settled cases.[12]

Based upon the foregoing, there is sufficient support to uphold

---

[12]In Orangeburg, deposition testimony established that the structure had asbestos in a ceiling which was to be demolished. After air samples and dust samples were taken, the underlying plaintiffs were ordered to follow abatement regulations. A substantial portion of the ceiling suffered extensive water damage. As a result, portions of the ceiling where ACBMs were

the trial court's determination that the liability of Gypsum in each of the underlying cases came within the respective coverage provisions of defendants' policies.

B. Policy Exclusions

We next turn to defendants' contentions that several of the various "own product," "named insured" or "repair and replacement"

---

installed were flaking off, frequently with leaks occurring every 10 or 15 feet. The ceiling also had been altered by electrical or plumbing work that required holes to be knocked through the ceiling.

In Huntsville, there was testimony of extensive water damage. The leaks in the roof of the buildings were so substantial that big garbage cans were put down all over the building to catch the water. Damaged pieces of ceiling would detach and fall to the ground. Moreover, apart from the water damage, there was a film of dust from the ceiling that collected all the time. When pieces of the ceiling fell, there would be a white powdery material around the fallen ceiling material. This material, which contained asbestos, was crumbly to the touch and had to be cleaned up daily. When the roof was being worked on it looked as if there were a fog in the building.

In Collier, there were visible particles of ceiling material on desktops on a regular basis. An exposure assessment indicated that the ACBMs were "very friable" and that dust could be produced by brushing against the plaster. The assessment also noted that there was an airstream blowing across the material and that that air was recirculating in the building. There was ceiling damage from the installation of an HVAC system and other damage, probably from water. Samples indicated the release of .01 fibers per cubic centimeter in some areas and .02 fibers per cubic centimeter in other areas. David Mayer, who was with the EPA, gave deposition testimony that although these fiber levels were low, it was significant that this material could be released during sampling.

In Enterprise, there was testimony that portions of the ceiling that contained ACBMs were cracking and falling to the floor. There were also spots where the ceilings were damaged and people scratched their names into the ceiling. A maintenance worker testified that the changing of a light bulb would cause the ceiling material to flake off. He stated that the dust from the ceiling would collect in certain spots and that it would take a broom to sweep it off. Hatfield, who gave deposition testimony in the underlying action, stated that he took bulk and carpet samples and that all but one of the samples showed the presence of released asbestos fibers. Some of these samples indicated a substantial number of fibers per square foot, although they were generally those shorter in length. Hatfield opined that there was no indication that certain levels of fiber release were "okay" while others were not.

exclusions contained in their policies preclude insurance coverage for property damage claims based on the installation of asbestos. Typically, the "own products" exclusion states that the insurance does not apply to

> "property damage to the named insured's products or premises altered by the named insured arising out of such products or premises or any part of such products or premises [or] work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials, parts or equipment furnished therewith."

Other provisions contained in the National American and London Market policies that are similar to the "own products" exclusions are "repair and replacement" exclusions. These exclusions provide that insurance coverage will not extend to costs "for repairing or replacing any defective product or products manufactured, sold, handled or distributed by the insured."

The "own products" or "repair and replacement" exclusions generally bar the insured from receiving coverage for property damage to its own product. (See *Maryland Casualty Co. v. W.R. Grace & Co.* (S.D.N.Y. 1991), 794 F. Supp. 1206; *Wilkin*, 144 Ill. 2d at 81-82.) This exclusion is premised on the understanding that liability policies are not intended to provide coverage for faulty workmanship, but rather for damage which the insured's product visits upon other property. (*Wilkin*, 144 Ill. 2d at 81-82.) As such, this exclusion insures that a general comprehensive liability policy does not function as a performance bond or a warranty for the insured's products. *Diamond State Insurance Co. v. Chester-Jensen Co.* (1993), 243 Ill. App. 3d 471, 484.

The dispute between the parties with respect to these exclusions does not encompass all of the damages involved in the underlying actions. Gypsum admits that this exclusion precludes recovery of the *value* of its defective product, *i.e.*, the plaster, or the replacement plaster. Defendants concede that the exclusion is inapplicable to damage done to other property. Rather, the dispute between the parties is whether there is coverage for the costs incurred in the *removing and replacing* of the installed asbestos.

■ Here, we do not think that the "own products" exclusion serves to preclude recovery for the costs of removing and replacing the ACBMs. The underlying property damage claims alleged that the asbestos fibers released by Gypsum's products damaged the building and other property within the building. These underlying claims were predicated upon that damage to the structure. This is not a situation where the insured's product simply failed to perform as expected. (See *Diamond State v. Chester-Jensen Co.*, 243 Ill. App. 3d

at 484 (noting that in *Wilkin* "the damage was not a result of the failure of the asbestos to perform its contractual function as an insulator. Rather its detrimental impact was caused by a wholly ancillary and coincidental phenomenon, namely the diffusion of its harmful fibers"); *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1980), 90 Ill. App. 3d 1106, 414 N.E.2d 41.) Rather, this is a case where the continuing production of a hazardous condition directly caused by the presence of the insured's product affirmatively damages the structure into which it has been incorporated as well as other property owned by the underlying claimants. See *Dayton*, 682 F. Supp. at 1412 (rejecting application of this exclusion to preclude coverage for property damage resulting from installation of ACBMs as plaintiffs sought money damages to compensate them for damages to their buildings and contents and "[p]laintiffs did not claim that the asbestos-containing products failed to perform the function or to serve the purpose for which they were purchased, *i.e.*, fireproofing or acoustical insulation").

This distinction between damage to the insured's own product and damage to the structure into which the insured's product is incorporated was recognized by our supreme court in *Wilkin*. There, the court rejected the insurers' arguments that the exclusion applied, stating:

> "Plaintiffs argue that these exclusions apply in the instant action, pointing to the fact that the underlying complaints seek recovery for the costs of the removal, repair and/or replacement of the asbestos-containing product. However, plaintiffs fail to recognize that the underlying complaints seek *** recovery for damage to property other than the product installed by Wilkin or Wilkin's workmanship. Therefore, these exclusionary clauses are inapplicable to the case at bar." *Wilkin*, 144 Ill. 2d at 82.

See also *Harbor Insurance Co. v. Tishman Construction Co.* (1991), 218 Ill. App. 3d 936, 942, 578 N.E.2d 1197 (recognizing "that recovery for the costs of removal, repair and/or replacement of asbestos-containing products [is] not precluded by [this] clause excluding damage to the insured's own work"); *Tobi Engineering, Inc. v. Nationwide Mutual Insurance Co.* (1991), 214 Ill. App. 3d 692, 698, 574 N.E.2d 160 (*Wilkin* held "that asbestos-related cost of repair and replacement is more than merely economic damage"); *Armstrong*, 26 Cal. Rptr. 2d at 97 (following *Wilkin*, *Dayton*, and *Maryland Casualty*, in concluding that "own products" exclusion does not apply to preclude coverage where the underlying claim seeks coverage for damage to the structure caused by asbestos contamination rather than damage to the ACBM); *Maryland Casualty v. W.R. Grace & Co.*, 794 F. Supp. at 1227, where the court stated:

"[I]n the present case, *** the underlying claimants are not suing for defects in [the insured's] own products. They do not contend that [the insured's] products fail to provide fireproofing and soundproofing. [Citation.] They seek damages for injury to their buildings because of the presence of asbestos. [Citation.] Their claims allege damage to other property into which [the insured's] products have been incorporated. The own products exclusion does not apply to such claims."

See also *Dayton*, 682 F. Supp. at 1412.

For the same reasons, we reject defendants' contentions that the "repair and replacement" exclusions in the National American and London Market policies preclude coverage for expenses incurred in the removal and replacement of the asbestos-containing materials. These exclusions specifically provide that insurance coverage will not extend to costs "for repairing or replacing any *defective* product or products manufactured *** by the insured." (Emphasis added.) These exclusions, however, do not apply by their own terms to the cost of repairing the damage done to other property, in this case the building and its contents, which has been caused by the incorporation of Gypsum's product into that structure. See *Wilkin*, 144 Ill. 2d 64, 578 N.E.2d 926; *Armstrong*, 26 Cal. Rptr. 2d 35; *Dayton*, 682 F. Supp. 1403 (and cases cited above).

Defendant AMICO argues that its exclusion (k), which is similar to the abovementioned exclusions, is a specifically negotiated exclusion which does not provide coverage for any of the claims in question. Exclusion (k) contained in AMICO's policy provides that the insurance does not apply:

"with respect to the products hazard and the completed operations hazard

(1) to the cost of repairing or replacing any goods, products or completed work;

(2) to the loss of use of any such goods, products or completed work or to damages resulting from the loss of use thereof;

(3) to nonsuitability for the intended purpose of goods, products or completed work;

(4) to any injury to or destruction of tangible property, including the loss of use thereof, which is caused by improper or inadequate performance, design or specifications;

but parts (3) and (4) of this exclusion do not apply to physical injury to tangible personal property other than physical injury caused by or necessitated by the repair or replacement of such goods, products or completed work."

AMICO argues that unlike other "repair or replacement" or "own product" exclusions, this clause is not directed to claims concerning

only the insured's work product. AMICO argues that this exclusion bars recovery for costs associated with the repair or replacement of *any* goods, products or completed work of any kind.

Although this exclusion is worded differently from other work product exclusions, that fact alone does not make it applicable to the case at hand. At its heart, this exclusion is intended to preclude coverage associated with the "repair or replacement of any goods, products or completed work." Even if we interpreted this exclusion to preclude repair or replacement costs for other goods besides those provided by the named insured, this exclusion would be inapplicable because the underlying actions at issue here do not seek coverage for the replacement of such items, but rather seek compensation for property damage that has been inflicted upon other property by the release of the asbestos fibers. (See *Wilkin*, 144 Ill. 2d at 82.) To accept that this type of claim is excluded from coverage would basically eliminate any property damage claim from coverage under the "comprehensive" liability policy by viewing every claim as one for replacement or repair rather than for property damage. (See *Wilkin*, 144 Ill. 2d at 82-83.) Consequently, we cannot say that the cost of the removal of asbestos is barred by these exclusions since such costs were incurred in remedying the damage done to the building and its contents by the release of fibers from Gypsum's products.

C. Lexington Settlement

Defendants American Re-Insurance Company and American Excess Insurance Company (American) argue that the trial court erred in ordering them to fully indemnify Gypsum for the $675,000 settlement in the Lexington case. American asserts that the provable compensatory damages in the Lexington case were only $377,000 and that the amount of the settlement in excess of the compensatory damages was attributable to Gypsum's desire to avoid an award of otherwise uninsurable punitive damages. American also contends that Gypsum's own mishandling of the Lexington case contributed to the amount in excess of the compensatory damages. In support of that argument, American points to the fact that Snell, who supervised the litigation for Gypsum, admitted that Gypsum's opening statement in the Lexington case was weak, that there were scheduling problems with Gypsum's expert witnesses, and that Gypsum's first witness was impeached.

We note at the outset that an insured has the right to settle a claim that has been brought against it. (*United States Fidelity & Guaranty Co. v. Klein Corp.* (1989), 190 Ill. App. 3d 250, 558 N.E.2d 1047.) In fact, the insured has a duty to settle reasonably and in good

faith and it bears the burden of proving that the amount of the settlement was reasonable. (*WestAmerica Mortgage Co. v. Tri-County Reports, Inc.* (N.D. Ill. 1987), 670 F. Supp. 819; *La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 408 N.E.2d 928.) A settling insurer must show that it "was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer." *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 169, 298 N.E.2d 289.

American initially contends that the portion of the settlement which exceeded the amount of provable compensatory damages was attributable to otherwise uninsurable punitive damages. Citing *Beaver v. Country Mutual Insurance Co.* (1981), 95 Ill. App. 3d 1122, 420 N.E.2d 1058, American argues that it is against Illinois public policy to allow insurance coverage for punitive damages which are not based on vicarious liability (*Scott v. Instant Parking, Inc.* (1969), 105 Ill. App. 2d 133, 245 N.E.2d 124), and, as such, Gypsum should not be allowed to recover any portion of the settlement which was based on punitive damages. We note that this argument might be extrapolated to question recovery of high-end compensatory damages paid in any settlement of sums to avoid exposure to punitive damages.

In response, Gypsum argues that the law of South Carolina, not Illinois, should be applied to determine the insurability of punitive damages. Gypsum contends that South Carolina, unlike Illinois, has no public policy barring insurance coverage for punitive damages. (See *South Carolina State Budget & Control Board v. Prince* (1991), 304 S.C. 241, 403 S.E.2d 643; *State Farm Mutual Automobile Insurance Co. v. Hamilton* (D.S.C. 1971), 326 F. Supp. 931.) In urging the application of South Carolina law under the "most significant contacts" test, Gypsum notes that the underlying action for which coverage was being sought was filed in South Carolina and that the events underlying the litigation occurred in that State. Moreover, with respect to defendant AMICO's policy, which specifically allows coverage for punitive damages "where permitted by law," Gypsum argues that that provision constitutes a contractual choice of law to apply the law of the State in which the claim for punitive damages arose.

We will first address the insurance policies issued by defendant American, which are silent as to the choice of law. In the absence of a specific choice-of-law provision, the general choice-of-law rules of the forum State, Illinois, control. (*Thieme v. Union Labor Life Insurance Co.* (1956), 12 Ill. App. 2d 110, 138 N.E.2d 857.) In insurance coverage actions, like contract actions in general, Illinois has applied the "most significant contacts test" to determine which forum's law

applies. (*Diamond State*, 243 Ill. App. 3d at 486.) Under this approach a number of factors are considered, including the "location of the subject matter, *** the domicile of the insured or the insurer, *** the place of performance" (*Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 528, 322 N.E.2d 454), and where the underlying action was filed. *Boise Cascade Home & Land Corp. v. Utilities, Inc.* (1984), 127 Ill. App. 3d 4, 13.

Here, a brief examination of the facts indicates that South Carolina law should be applied to determine the insurability of the potentially punitive portion of the Lexington case. South Carolina was the place where the underlying action was filed, where the underlying plaintiff was domiciled, and where the underlying injury occurred. As such, that forum would have the greater interest in determining whether the insured should be able to recover costs relating to the potentially punitive portion of the settlement entered into in that underlying action. See *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co.* (1990), 209 Ill. App. 3d 144, 568 N.E.2d 9; see also *Diamond State*, 243 Ill. App. 3d at 487-88.

Likewise, the determination that South Carolina law would apply to the insurability of the Lexington settlement would be even stronger with respect to the policy issued by defendant AMICO. "Where permitted by law" provisions, such as that contained in AMICO's policy, have been held to contractually apply the law of the State where the risk is located and where the underlying claim arose. See *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co.*, 209 Ill. App. 3d at 154.

■ Although we have determined that South Carolina law would apply to this issue under the most significant contacts test with respect to defendant American and under the contractual choice-of-law provision as well with respect to AMICO, the question remains as to whether Illinois, as the forum State, will enforce the law of South Carolina insofar as it may be violative of Illinois public policy.

We first address that question with respect to defendant AMICO. In *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co.* (1990), 209 Ill. App. 3d 144, 568 N.E.2d 9, this court was confronted with a situation substantially similar to the one before us. An underlying claim which sought punitive damages was filed against the insured in Arizona. The insurance policy contained a phrase which allowed recovery of punitive damages "where permitted by law." The *International Surplus* court initially established the proper framework for its determination, stating that public policy considerations "must be of a strong and fundamental nature to justify the rejection of the chosen law of the parties" and that the law of an-

other jurisdiction would be applied unless "contrary to the public morals or natural justice, or unless the enforcement of it would be of evil example or harmful" to the people of Illinois. *International Surplus Lines Insurance Co.*, 209 Ill. App. 3d at 155-56.

In concluding that Arizona law could be applied in spite of the fact that it conflicted with Illinois public policy, the *International Surplus* court noted that the application of Arizona law would not have much of an effect on Illinois citizens or on Illinois' regulation of its insurers and that Arizona had a significant interest in the determination of the issue. The court also acknowledged the "stronger and more fundamental policy of Illinois *** that when payment of a premium is made by an insured and accepted by an insurance company and coverage is promised in return therefor, the insurer should be required to fulfill its contractual obligations." 209 Ill. App. 3d at 157.

Similarly, here we cannot say that the application of South Carolina law will have much of an effect on Illinois citizens or on Illinois' regulation of its insurers. Moreover, like Arizona in *International Surplus Lines*, South Carolina has a significant interest in regulating the insurers who issue policies covering underlying claims which occur in that State, as well as punitive damages assessed in those actions.

American argues that unlike the policy in *International Surplus Lines* or the AMICO policy here, its policy did not specifically include a provision allowing for the recovery of punitive damages. We do not think, however, that the absence of an explicit punitive damages provision vitiates the otherwise proper application of South Carolina law. The same concerns which the *International Surplus Lines* court relied upon in determining that the application of Arizona law was proper even though it violated the public policy of Illinois are all present in this case as well.

Consequently, there is no reason to preclude indemnity for a settlement which is directly attributable to punitive damages as long as that settlement is otherwise reasonable. Although courts must be careful to avoid approving a settlement entered into for the purpose of obtaining coverage for an otherwise uninsurable claim, that concern is absent here as any potential award of punitive damages would have been insurable under South Carolina law. See *South Carolina State Budget & Control Board v. Prince* (1991), 304 S.C. 241, 403 S.E.2d 643; *State Farm Mutual Automobile Insurance Co. v. Hamilton* (D.S.C. 1971), 326 F. Supp. 931.

We next turn to American's contention that the trial court erred in determining that the amount of the Lexington settlement was rea-

sonable because the excessive part of that settlement was attributable to Gypsum's mishandling of the trial in that case. A trial court's determination that the amount of a settlement is reasonable will not be set aside unless it is against the manifest weight of the evidence.

As previously mentioned, American points to the fact that Snell admitted that Gypsum's opening statement in the Lexington case was weak, that there were scheduling problems with Gypsum's expert witnesses, and that Gypsum's first witness was impeached in support of its contention. The fact that the trial in the underlying Lexington case was not going well from the perspective of Gypsum's counsel, however, does not preclude a determination that the settlement was reasonable. Snell confirmed that the amount in question was the best price he could negotiate at that point and there was no testimony in the coverage action indicating that the case could have been settled for a lesser amount prior to the start of trial. We also note that the attorney retained to represent Gypsum in the Lexington case was a past president of the South Carolina Bar and a fellow in the American College of Trial Lawyers whose firm regularly handled insurance defense work.

Moreover, even if these factors were at least partially in Gypsum's control, a settlement reached based on the insured's dissatisfaction with the manner in which the trial is proceeding does not necessarily make the settlement unreasonable. (See *McNicholes v. Subotnik* (8th Cir. 1993), 12 F.3d 105.) In fact, some courts have taken the position that the weak posture of an ongoing case at the time the case is settled is a positive factor to be considered in assessing the reasonableness of a settlement. See *Clarostat Manufacturing Co. v. Travelers Indemnity Co.* (1985), 115 A.D.2d 386, 495 N.Y.S.2d 671.

Even without that basis, however, there is enough to conclude that the trial court's determination as to the reasonableness of the Lexington settlement is not against the manifest weight of the evidence. In entering into a settlement agreement in the Lexington action, it appears that Gypsum was responding to a reasonable anticipation of liability. In this respect, there was testimony in the underlying action by a member of the Lexington school board that established the amount of compensatory damages as $377,000. There was also testimony concerning the highly friable condition of the asbestos-containing building materials which established that so much material was released on a daily basis that it looked like it had been snowing indoors each day. Moreover, in assessing the trial court's determination of reasonableness, we cannot overlook the possibility that punitive damages would be awarded. In light of these factors, it would appear that Gypsum settled the case in reasonable

anticipation of liability. *Luria,* 780 F.2d at 1091-92; *Federal Insurance Co. v. National Distribution Co.* (1992), 203 Ga. App. 763, 417 S.E.2d 671.

GYPSUM'S APPEAL

A. Trigger of Coverage

We now turn to the issues raised by Gypsum in its appeal. Gypsum first contends that the trial court applied the wrong coverage trigger. Under the "discovery" method adopted by the trial court, the policy in effect at the time the underlying property owner discovered the presence of asbestos provides the coverage.

The insurance coverage decisions discussing the appropriate trigger of coverage have been less than consistent. In addition to the discovery trigger, courts have identified and implemented at least four different types of triggers in deciding which insurance policy, if any, provides coverage for a specific claim. (See, *e.g., Uniroyal, Inc. v. Home Insurance Co.,* 707 F. Supp. at 1387.) In *Dow Chemical Co. v. Associated Indemnity Corp.* (E.D. Mich. 1989), 724 F. Supp. 474, the court summarized the alternative types of triggers as follows:

"If coverage is triggered at the time that personal injury or property damage becomes known to the victim or the property owner, the approach is identified as the '*manifestation* theory.' [Citation.] If coverage is triggered when real personal injury or actual property damage occurs, the approach is called the '*injury in fact* theory.' [Citation.] If coverage is triggered when the first exposure to injury-causing condition occurs, then the court is said to have chosen the '*exposure* theory.' [Citation.] Finally, if coverage is triggered in a manner such that insurance policies in effect during different time periods *all* impose a duty to indemnify, then the approach is labelled a '*continuous*' or '*multiple*' trigger theory. (Emphasis added.)" *Dow Chemical Co. v. Associated Indemnity Corp.,* 724 F. Supp. at 478.

No Illinois court to date has addressed the issue of the appropriate coverage trigger for asbestos property damage claims. The Illinois Supreme Court, however, has established the appropriate trigger of coverage in the context of cases involving "bodily injury" from asbestos exposure in *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150. In *Zurich,* the Illinois Supreme Court determined that the unambiguous language of the insurance policy required that "bodily injury" occur during the policy period to trigger coverage. In so doing, the court rejected the argument that coverage was triggered *solely* upon the occurrence of a

single discreet event, such as manifestation of the disease or initial exposure, or that it was triggered continuously from the time the claimant was initially exposed to the fibers through the time the disease first manifested itself. (118 Ill. 2d at 34.) The court held that the policies were triggered under the bodily injury prong at the initial exposure, when the disease manifested itself and at any interim time where the claimant suffered some sickness. *Zurich Insurance Co.*, 118 Ill. 2d at 47.

Courts, however, are generally reluctant to apply coverage triggers used in asbestos bodily injury cases to cases involving property damage from asbestos installation. They have reasoned that, unlike property damage from asbestos exposure, the bodily injury resulting from asbestos exposure is "immediate, cumulative and exacerbated by repeated exposure." *Home Insurance Co. v. Landmark Insurance Co.* (1988), 205 Cal. App. 3d 1388, 1395, 253 Cal. Rptr. 277, 281 ("[c]ommon sense tells us that property damage cases, even those involving continuous damage \*\*\* differ from asbestos bodily injury cases where injury is immediate, cumulative and exacerbated by repeated exposure"); see also *Prudential-LMI Commercial Insurance Co. v. Superior Court* (1990), 51 Cal. 3d 674, 798 P.2d 1230, 274 Cal. Rptr. 387; B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes (6th ed. 1993).

We recognize that "bodily injury" and "property damage" are two distinct concepts which may require different characterizations of their respective coverage triggers. The underlying conceptual approach to the trigger, however, need not be that dissimilar. According to *Zurich*, bodily injury in asbestos cases is present upon exposure and again upon manifestation of the disease and at such time where the claimant has suffered some "sickness." Although there may be a question as to the specific policy period during which injury occurred, what constitutes damage, *i.e.*, exposure, sickness and manifestation, is fairly clear.

Accordingly, although there are differences between the trigger considerations for asbestos bodily injury and property damage cases, our supreme court's decision in *Zurich* provides several indications as to what type of trigger may be appropriate in property damage cases. First, *Zurich* recognized that injury could occur in multiple policy periods which were spread over a substantial period of time. Second, *Zurich* further recognized that although the manifestation of the disease constituted a bodily injury, the precursor(s) to that manifestation, exposure and possibly sickness, were also bodily injuries that could trigger coverage under the policies. With these considerations in mind, we turn to the question of the appropriate property damage trigger in this case.

■ To determine the appropriate trigger of coverage we must first look to the language of the policies. (*Zurich Insurance Co.*, 118 Ill. 2d at 43-44.) As previously discussed, the policies at issue here vary, but generally provide that the insurer agrees to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages *** because of *** property damage to which this policy applies, caused by an occurrence." They also state that the "policy applies only to occurrences which take place during the policy period."

These policies unambiguously provide that they cover property damage resulting from an occurrence which happens during the policy period. As such, if property damage within the meaning of the policy occurs during the policy period in question, coverage is triggered. There is no language, however, which conditions, limits, or connects the existence of property damage to when that damage was discovered.

This has led many courts to reject the use of a discovery trigger in the context of asbestos property claims. In *Armstrong World Industries v. Aetna Casualty & Surety Co.* (26 Cal. Rptr. 2d at 85), the court first noted that the adoption of a trigger based on when the asbestos was discovered would lead inexorably to the conclusion that all the damage occurred during one policy period. The court rejected this trigger theory stating that "[t]here is nothing in the language of the CGL [comprehensive general liability] policies to require as a condition of coverage that the damage be discovered at any point in time." *Armstrong World Industries*, 26 Cal. Rptr. at 90. See also *Dow Chemical Co. v. Associated Indemnity Corp.* (E.D. Mich. 1989), 724 F. Supp. 474, 481 (where the court, in interpreting policies worded similarly to those before us, stated that the "policy language does not even hint that property damage must be known to anyone in order to trigger coverage. Likewise, nothing in the policy indicates that property damage does not exist unless someone knows about it").

Moreover, although this trigger would lessen to some degree the difficulty of proving that coverage was triggered at a certain time, the use of a discovery trigger would arbitrarily and unfairly require that the entire property damage burden be borne by primary insurers who insured risks in the later years. This is so in spite of the fact that numerous insurance companies were paid to insure against the damage during the period of time at issue. Placing the burden on the insurers which issued the policies covering the period of discovery is especially troubling considering that the precise damage which did occur, *i.e.*, the release of asbestos fibers, could have begun immediately after the installation of the asbestos-containing materials. As noted by the *Armstrong* court:

"[T]he health hazard allegedly created by the presence of ACBM occurred no less at installation than upon the realization of the dangers of asbestos. That the building owners were unaware of the dangers until years after installation of the ACBM does not mean that the hazard was not present or that damage did not occur. Nor does the fact that the damage was not susceptible of measurement until the dangers of asbestos were known obviate the occurrence at an earlier time." *Armstrong World Industries v. Aetna Casualty & Surety Co.*, 26 Cal. Rptr. 2d at 91.

See also *Maryland Casualty Co. v. W.R. Grace & Co.* (2d Cir. 1993), 23 F.3d 617, 626 ("under the occurrence definitions here at issue coverage is triggered upon the existence of property damage independent of its discovery").

Defendant AMICO urges that the first discovery trigger was the one generally employed by Gypsum and its insurers in earlier cases, most of which were not asbestos-related claims. The circuit court found that this course of dealing between the parties supported its application of a first discovery trigger. The prior dealings of a party are a matter of parol evidence that should not be considered unless the language of the policies is ambiguous. (*Kennedy, Ryan, Monigal & Associates, Inc. v. Watkins* (1993), 242 Ill. App. 3d 289, 609 N.E.2d 925; *Sheridan v. James W. Rouse & Co.* (1982), 109 Ill. App. 3d 841, 441 N.E.2d 647.) No such finding was made. Even if otherwise admissible, this parol evidence is only one consideration in their interpretation.

Defendant AMICO also urges that the trial court was correct in its application of a discovery trigger because property damage does not occur until that damage is known. Similarly, defendant Fireman's Fund argues that the testimony of Dorchester and Koehn established that property damage is a fundamentally economic matter and that such damage cannot result in "any meaningful way until it is perceived by the public." It argues that "prior to a perception by the public that a given property is damaged, the value of property remains unchanged and it cannot be reasonably said that an accident or condition has *resulted* in property damage." Consequently, according to Fireman's Fund, no property damage occurred until the alleged hazards of asbestos-containing materials were discovered.

This contention was accepted by the trial court and became the predicate for its implementation of a discovery trigger. We disagree, however, with the basic underlying premise that the diminution in the market value of the property constitutes property damage under the coverage provisions of the policies. If the diminution in value is

not a prerequisite to finding the occurrence of property damage, then it cannot serve as the predicate for the discovery rule. Accordingly, the deployment of a discovery trigger becomes a wholly arbitrary invention.

Defendants' argument and the trial court's holding are substantially similar to the position that was rejected by the Illinois Supreme Court in *Wilkin*. There, plaintiffs claimed that the presence of ACBMs resulted only in economic loss in the form of diminished market values. The supreme court rejected this argument, stating:

> "This court *** has already found that asbestos fiber contamination constitutes physical injury to tangible property, *i.e.*, the buildings and their contents. [Citation.] In *Board of Education*, we rejected the same argument that the instant plaintiffs now make. There this court found:
>> '[I]t would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building which by law must be corrected. ***
>> * * *
> *** The essence of the allegations [of the complaints] is that the buildings have been contaminated by asbestos to the point where corrective action, under the law, must be taken. Thus, the buildings have been damaged.' [Citations.]" *Wilkin*, 144 Ill. 2d at 75-76.

See also *Board of Education*, 131 Ill. 2d at 446.

Although the *Wilkin* decision is a duty-to-defend case, that decision nevertheless rejected the notion that damage resulting from the installation of asbestos is dependent upon, or linked to, the market values of the buildings in question. The trial court's rationale in the case at bar for implementing the discovery trigger mistakenly viewed the damage in question from a purely market value perspective, rather than from the physical injury vantage point that *Wilkin* prescribes.

The Second Circuit recently rejected this same diminution in market value argument, stating:

> "A reduction in marketability serves as a measure of damages, but it does not constitute an injury to property itself. Rather, it is an effect of injury. Under proper analysis, an event causes injury to property, and this injury in turn causes a decline in market value. In other words, the 'decrease in market value merely reflects the recognition that something bad has happened to the building[, and that] "something bad" is the incorporation of the defective product.' [Citation.] *** Building owners seek to remedy conditions directly concerning their structures either by removing

or encapsulating asbestos. In making such changes, the owners will affect the buildings' market values. The damage that building owners are seeking to 'undo' is not the fact that they discovered asbestos, but the fact of its incorporation in their buildings." *Maryland Casualty Co.*, 23 F.3d at 627.

As such, we conclude that the trial court erred in using a discovery trigger in determining which insurance policies provided coverage. Although the discovery trigger provides greater certainty and simplicity of implementation, it does so at the expense of the clear language of the policies and the insurers who provided coverage during the post-discovery period.

Defendant First State Insurance, which provided coverage in the later years at issue here, urges the adoption of the injury-in-fact trigger. It argues that the language of the insurance policy supports that interpretation.

We agree with defendant First State to the extent that the language of the policies at issue would be triggered if property damage occurred during the term covered by the policy. The adoption of an injury-in-fact trigger, however, is not inconsistent with a finding that an injury occurred in more than one policy period or that such an injury occurred in each policy period.

Conceptually, the injury-in-fact trigger and the continuous trigger are on the same continuum and are complementary, rather than mutually exclusive. Accordingly, courts have stated that "where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine, the continuous injury trigger may be employed to equitably apportion liability among insurers." (*Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.*, 76 Haw. at ____, 875 P.2d at 917; see also *Uniroyal*, 707 F. Supp. at 1392.) The *Sentinel* court further explained:

"[P]articular difficulty has been encountered when an injury process is not a definite, discrete event—for example, where the damage continues progressively over time spanning different insurer's policy terms. In this situation, courts have invoked an equitable 'continuous injury' trigger of coverage. Under this theory, property damage is deemed to have 'occurred' continuously for a fixed period (the 'trigger period'), and every insurer on the risk at any time during that trigger period is jointly and severally liable to the extent of their policy limits, the entire loss being equitably allocated among the insurers. [Citations.] The trigger period begins with the inception of the injury and ends when the injury ceases." *Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.*, 76 Haw. at ____, 875 P.2d at 915.

As such, other courts have frequently utilized a continuous trigger in asbestos cases or in analogous cases, such as those involving chemical seepage or other types of progressive inseparable damage. (See *Harleysville Mutual Insurance Co. v. Sussex County* (D. Del. 1993), 831 F. Supp. 1111 (applying continuous-trigger theory in determining when leaching of contaminants from landfill to adjacent property resulted in property damage); *New Castle County v. Continental Casualty Co.* (D. Del. 1989), 725 F. Supp. 800, *aff'd in part & rev'd in part* (3d Cir. 1991), 933 F.2d 1162.) On point is *Owens-Illinois Inc. v. United Insurance Co.* (1993), 264 N.J. Super. 460, 625 A.2d 1. There, the court applied a continuous trigger in determining which insurance policy of an asbestos manufacturer was triggered in a case involving both bodily injury and property damage claims. The court, interpreting language similar to that in the policies before us, determined that all the insurance policies from the exposure to or installation of asbestos, to manifestation or discovery of damage, were triggered. The court reasoned that this theory "best accommodates the competing interests of insurers and the insured" and that this interpretation was consistent with the philosophy of insurance which seeks "an exchange of an uncertain loss [risk of legal liability] for a certain loss [the insurance premium]." (*Owens-Illinois Inc. v. United Insurance Co.*, 264 N.J. Super. at 507, 625 A.2d at 25.) Specifically, with respect to property damage, the court determined that "an ongoing process of property damage triggers every policy during the destructive process." *Owens-Illinois Inc. v. United Insurance Co.*, 264 N.J. Super. at 510, 625 A.2d at 27. See also *Dayton Independent School*, 682 F. Supp. at 1409-10, *rev'd on other grounds* (1990), 896 F.2d 864 (applying continuous-type trigger based on the fact that "[p]laintiff's complaint asserts that [the insured's] products were defective from the time of installation and that they released, or threatened to release, asbestos fibers into the buildings through a gradual process of deterioration, as well as through routine maintenance activities and other disturbances" and that this occurred until the products were removed or contained).

The claims seeking coverage for property damage caused by asbestos fiber release are prototypes for the appropriate application of the equitable continuous trigger. The property damage in the underlying cases, whether from the presence of airborne fibers or settled fibers subject to reentrainment, occurs over a span of time and cannot be linked to or confined to different policy periods. The difficulty in determining precisely when the damage occurred or in following its progress or proliferation is further exacerbated by the interchangeable nature of the fibers and that their release occurs on

a continuing basis. The precise amount of airborne released fibers and grounded fibers that could be reentrained changes on a continuing basis. The burden of proving exactly when property damage occurred would be virtually impossible. See *Reliance Insurance v. Armstrong World Industries, Inc.* (1992), 259 N.J. 538, 563-64, 614 A.2d 642, 655 ("[t]he 'continuous trigger' concept of insurance coverage recognizes that it is probably impossible to ascribe damage to any particular policy year in the damage proliferation process, and thus, the entirety of insurance coverage existent during the years of proliferation, should be available for indemnification").

Our decision is consistent with the basic principles announced in *Zurich* and *Wilkin*. The supreme court's use of a triple trigger in *Zurich* recognizes that multiple policy periods can be triggered by the evolving nature of an illness resulting from the exposure to asbestos. Similarly, our application of a continuous trigger recognizes that the property damage that results from the release of asbestos fibers and the reentrainment of asbestos fibers is a continuing process which necessarily occurs over multiple policy periods. The *Zurich* decision looks beyond the discrete event of the manifestation of the disease as the sole trigger. Similarly, the seductive appeal of a single discovery trigger must bow to the policy language as well as to the empirical realities and other general equitable considerations of reasonableness and fairness.

Defendants AMICO and Interstate contend that Gypsum failed to prove that there was continuous injury here. They argue that Gypsum did not prove that there was fiber release in every period and that the underlying cases never directly or indirectly decided these issues. They contend that Hatfield could not pinpoint when fiber release occurred and that it takes more than the mere release of fibers to constitute property damage.

These arguments ignore the rationale upon which the application of the continuous trigger is based. If Gypsum could readily offer proof of these factors, an injury-in-fact, rather than a continuous, trigger would be appropriate. The application of such a trigger, however, would deprive Gypsum of insurance coverage as it may be able to prove property damage, but be unable to prove during which policy period(s) such damage occurred. That the time at which fibers were released could not be pinpointed and that it would be impossible to prove whether there was property damage 30 years earlier during a particular policy period provide the basis of this trigger. (*Reliance Insurance v. Armstrong World Industries, Inc.*, 259 N.J. at 565, 614 A.2d at 656; see also *Uniroyal*, 707 F. Supp. at 1388 (applying continuous-trigger theory in Agent Orange litigation, noting that

"feasibility of identifying, even approximately, the time of injury in fact in many modern toxic tort cases must be in serious doubt").) As such, an attack on Gypsum's failure to offer evidence of these factors is unavailing.

B. Per Occurrence Deductibles

Gypsum next contends that the trial court erred in interpreting the "per occurrence" deductibles contained in the policies issued by defendant AMICO from 1961 to 1963 and 1971 to 1975. In interpreting these policies, the trial court concluded that each discrete discovery of ACBMs constituted a separate occurrence and consequently multiple occurrences were present in various policy years for purposes of calculating the amount of the deductibles. Gypsum urges that its singular continuing process of the manufacture and sale of asbestos-containing products constituted a single occurrence for each policy period. Defendant AMICO argues that each installation of the asbestos-containing products constituted a separate occurrence.

In interpreting the deductible provisions of an insurance policy, as in the case with all contract construction, we must first look to the language of that policy. (*Scottish & York International Insurance Group/ Guarantee Insurance Co. v. Comet Casualty Co.* (1990), 207 Ill. App. 3d 881, 566 N.E.2d 477.) The applicable provision in the 1961-63 policy provided:

"$2,500.00 shall be deducted from the total amount of all sums which the insured shall become legally obligated to pay as damages on account of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as the result of any one accident.

* * *

*** [I]t is agreed as respects physical injury to or destruction of tangible property, real or personnel [*sic*], and the resulting loss of use of such property an 'occurrence' shall be deemed to be an 'accident' subject to the following provisions:

1. 'occurrence' shall mean sudden or continuous or repeated exposure to any condition resulting in such injury or destruction during the policy period ***

2. all such injury or destruction caused by continuous or repeated exposure to substantially the same condition shall be deemed to result from one occurrence and shall be subject to the 'such accident' limit of property damage liability."

The relevant language from the policies covering 1971-75 is as follows:

"It is agreed that the deductible amount designated below shall apply subject to the following conditions:

* * *

2. The deductible amount shall apply 'per occurrence' to the Bodily Injury and Property Damage combined regardless of the number of persons or organizations seeking damages on account thereof;

3. All damages arising out of a common defect, condition or cause shall be considered as arising out of one occurrence shall apply thereafter."

The 1961-63 AMICO policies contained a $2,500 deductible to be applied on a "per occurrence" basis. The 1971-75 AMICO policies provided for a $25,000 "per occurrence" deductible from 1971 to October 1, 1974, and a $50,000 "per occurrence" deductible thereafter.

The status of Illinois law in this area was discussed in *Illinois National Insurance Co. v. Szczepkowicz* (1989), 185 Ill. App. 3d 1091, 1094-95, 542 N.E.2d 90, where the court stated:

"Despite numerous decisions in other jurisdictions, Illinois law was unclear until recently regarding the interpretation of 'occurrence' or 'accident' in liability policies for determining whether one or multiple accidents existed. A majority of foreign courts have concluded that the number of occurrences is determined by referring to the cause or causes of the damage (the 'cause' theory), as opposed to the number of individual claims or injuries (the 'effect' theory). [Citation.] *** Illinois has followed the majority of jurisdictions, which have concluded that the number of occurrences is determined by referring to the cause or the causes of the damage rather than to the number of individual claims or injuries."

(Accord *Mason v. Home Insurance Co.* (1988), 177 Ill. App. 3d 454, 459, 532 N.E.2d 526 ("number of occurrences is determined by referring to the cause or causes of the damage, rather than to the number of individual claims or injuries"); see also *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence* 64 A.L.R.4th 668 (1988).) We adhere to the majority rule as enunciated in *Szczepkowicz*.

The trial court, however, did not purport to base its determination on the cause or causes of the damage, but rather upon its consequence, the first discovery of the damage by the underlying property owner. As previously mentioned, the trial court concluded that each discovery of asbestos-containing materials constituted a separate occurrence. In this respect, the trial court erred. The trial court's approach would, in effect, implement the minority rule "effect" theory, which focuses on the number of injuries or claims in question as

each discovery would be an essential precursor to each injury or claim. That approach has been rejected by the court in *Szczepkowicz* as well as by a majority of jurisdictions. *Szczepkowicz*, 185 Ill. App. 3d at 1094-95.

■ We agree with the approach taken in *Szczepkowicz* that the occurrence for purposes of calculating the deductible should look to the cause of the damage and, for the reasons discussed below, we conclude that that cause should be characterized as the continuing process of the manufacture and sale of asbestos-containing products. On point again is *Owens-Illinois Inc. v. United Insurance Co.* (1993), 264 N.J. Super. 460, 625 A.2d 1. There, a manufacturer of asbestos-containing products filed a declaratory judgment action seeking a declaration of coverage for underlying claims filed against it. The court concluded that the claims against the manufacturer "arose 'out of a series of interrelated acts ... and that they should be treated as a single [occurrence] or loss for purpose of calculating the deductible.' " (*Owens-Illinois Inc. v. United Insurance Co.*, 264 N.J. Super. at 500, 625 A.2d at 21.) The *Owens* court determined that the manufacture and sale of the asbestos-containing products must be regarded as a single occurrence and that the insured was subject to a single deductible for each policy period. *Owens-Illinois Inc. v. United Insurance Co.*, 264 N.J. Super. at 503, 625 A.2d at 23.

Our conclusion that only one occurrence is present here is fully supported by language contained in the policies' deductible provisions. The pertinent portion of the deductible provision of the 1961-63 AMICO policy states that "all such injury or destruction caused by *continuous or repeated exposure to substantially the same condition* shall be deemed to result from one occurrence." (Emphasis added.) Likewise, the 1971-75 AMICO primary policies provided that "all damages *arising out of a common defect, condition or cause* shall be considered arising out of one occurrence." (Emphasis added.)

This language demonstrates that damage which resulted from "substantially the same condition" or out of "a common defect" must be considered to have constituted a single occurrence. (See *Chemstar, Inc. v. Liberty Mutual Insurance Co.* (C.D. Cal. 1992), 797 F. Supp. 1541, 1547-48 (interpreting similar "repeated exposure" language to find that 28 plaster-pitting claims constituted a single occurrence).) In interpreting policies with similar language, courts have concluded that the continuing manufacture and sale of asbestos-containing products constitutes a single occurrence. See *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity* (E.D. Penn. 1989), 707 F. Supp. 762, 773 ("in both the underlying asbestos litigation and the underlying welding litigation, the claimants' alleged injuries

resulted from a single proximate cause—the continuing sale of plaintiff's asbestos-containing products and welding products"); *Stonewall Insurance Co. v. National Gypsum Co.* (S.D.N.Y. 1992), 86 Civ. 9671 (occurrence was the decision of the insured to manufacture and sell asbestos-containing products). See also *Owens-Illinois Inc. v. Aetna Casualty & Surety Co.* (D.D.C. 1984), 597 F. Supp. 1515, 1527, where the court addressed the number of occurrences with respect to asbestos exposure actions, stating:

> "[T]he policies definition of occurrence and unifying definitional principles focus on the cause of injury. Therefore, the Court's inquiry is whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages. [Citation.] Analysis should focus on 'the underlying circumstances which resulted in the claim for damages.' Here, the underlying circumstance that gave rise to the claims for damages was [the insured's] manufacture and sale of a hazardous asbestos-containing product. [The insured] was insuring against its liability for personal injuries arising out of its products. [The insured's] liability in the underlying suits is premised on the claimants' submission of proof that among the asbestos fibers that he inhaled was an asbestos fiber from [the insured's product]. [Citation.] It is undisputed that all suits brought by all claimants share a common feature: each claimant alleges at least one exposure to [the insured's] asbestos-containing product."

That only a single occurrence is present is further supported by the decisions involving other analogous products. Generally, courts have determined that "if the continuous production and sale of an intrinsically harmful product results in similar kinds of injury or property damage, then all such injury or property damage results from a common occurrence." (*Dow Chemical Co. v. Associated Indemnity Corp.* (E.D. Mich. 1989), 727 F. Supp. 1524, 1530; see also *Uniroyal, Inc. v. Home Insurance Co.*, 707 F. Supp. at 1383 (court interpreting policy language similar to that here determined that manufacturer's "routinized" and "repetitive" deliveries of Agent Orange constituted a single occurrence as a "continuous or repeated exposure to conditions" for purposes of determining number of deductibles); *Champion International Corp. v. Continental Casualty Corp.* (2d Cir. 1976), 546 F.2d 502 (insured's sale and distribution of defective panels to over 1,000 different claimants determined to be one occurrence); *Cargill, Inc. v. Liberty Mutual Insurance Co.* (D. Minn. 1979), 488 F. Supp. 49, *aff'd* (8th Cir. 1980), 621 F.2d 275 (manufacturer's change in formula of soybean flours constituted a single occurrence in spite of fact that sale of soybean flours occurred at different times and adversely affected numerous production

batches of antibiotics); *Chemstar, Inc. v. Liberty Mutual Insurance Co.* (C.D. Cal. 1992), 797 F. Supp. 1541 (28 plaster-pitting claims constituted a single occurrence as the cause of each was plaintiff predecessor's failure to warn).) Courts have also determined that a single occurrence is present if the insured's conduct is repetitive and results in a number of similar injuries. See, *e.g., Wilkinson & Son, Inc. v. Providence Washington Insurance Co.* (1973), 124 N.J. Super. 466, 307 A.2d 639 (employee's damage to carpeting in 34 different apartments over a two-day span constituted a single occurrence); *E.B. Michaels v. Mutual Marine Office, Inc.* (S.D.N.Y. 1979), 472 F. Supp. 26 (single occurrence was present even though 200 separate holes were inflicted on ship's surface over a nine-day period by the repeated negligent droppings of grab buckets).

▌ Defendant AMICO does not argue that the trial court was correct in concluding that each discovery of asbestos-containing materials constituted a separate occurrence. Instead, AMICO argues that each installation of asbestos-containing products in a building constitutes a separate occurrence. This approach, which looks to the discrete multiple causes to trigger multiple deductibles, has been rejected in the cases discussed above. (See, *e.g., Champion,* 546 F.2d at 506; *Owens-Illinois,* 597 F. Supp. at 1527; see also *Mason v. Home Insurance Co.* (1988), 177 Ill. App. 3d 454, 459-60, 532 N.E.2d 526 (type of activity in which the insured engages in should be considered in determining the number of occurrences).) It would be unwise and without support in case law to determine that each installation of the asbestos-containing products constituted a separate occurrence when Gypsum's liability is predicated on its involvement in the manufacture and sale of the products rather than the installation of the products.

C. Excess Insurance Coverage

The last issue raised by Gypsum's appeal concerns the availability of excess insurance coverage. During the policy period years from 1949 through 1984 Gypsum carried several layers of excess liability insurance. While the range of the amount of excess liability insurance Gypsum carried varied over this period of time, it generally carried approximately $5 million in excess coverage from 1961 through 1966, $25 million in excess coverage from 1967 through 1978, and $50 million in excess coverage from 1978 through 1984. Its primary coverage during any policy period year from 1949 through 1984 never exceeded $500,000.

The trial court's application of a trigger under which coverage ran from the discovery of the asbestos through its removal and the

application of the continuous-trigger theory that we have adopted on appeal allow coverage under several different policy periods to be triggered by the same claim. The issue which we must now decide is whether the trial court was correct in its order of January 8, 1990, in requiring that Gypsum exhaust all available primary insurance before seeking coverage from any policy that provides excess coverage to any particular primary policy which was triggered. Gypsum challenged that ruling.

Defendant Continental Casualty Co. (CNA) argues that this issue is moot because there is no justiciable controversy between Gypsum and any of its primary carriers or first level excess carriers that provided coverage for the years after 1978, the only policy periods invoked by the trial court's discovery trigger. In this respect, CNA argues that Gypsum purchased "fronting" primary insurance for the period after February 15, 1978. According to CNA, this type of insurance required Gypsum to reimburse 100% of all sums paid for defense or indemnification of a claim until the primary insuring limits are exhausted. CNA argues that Gypsum, in effect, served as its own primary insurer during those years, and as such, a determination of the primary exhaustion issue is meaningless as Gypsum will be responsible for the primary insurance costs regardless of which policy periods are triggered. CNA further argues that the ruling on this issue would not affect Gypsum's first layer excess insurers during the post-1978 period, Northbrook and Transit, because Gypsum settled with Northbrook during trial and Transit is currently in liquidation.

We reject CNA's contention that this issue is moot. First, this argument is necessarily predicated upon the application of a discovery trigger that concerned policies providing coverage after 1978. Since we have rejected this trigger and adopted the continuous-trigger theory, primary, and probably excess, policies issued prior to 1978 will be triggered and the issue of the exhaustion of primary policies will be viable regardless of whether any of the post-1978 insurance carriers will be otherwise affected.

Moreover, we disagree with CNA's assertion that Gypsum's purchase of fronting insurance for the period following 1978 renders the primary exhaustion issue moot. The crux of this issue is how much primary insurance must be exhausted before Gypsum can seek coverage under an excess policy. If Gypsum is, in effect, self-insured over several policy periods, the decision on the primary exhaustion issue will determine whether Gypsum will have to absorb only the amount of one triggered policy period before seeking excess coverage or whether it must absorb multiple periods, *i.e.*, exhaust all triggered primary insurance, before seeking excess coverage.

In fact, it is highly likely that Gypsum's attempt to tap the wealth of excess insurance policies without first exhausting all the available primary coverage is linked to its purchase of fronting insurance in the post-1978 period. If Gypsum's argument allowing an excess insurance policy to be reached upon the exhaustion of one primary policy is accepted, Gypsum could avoid absorbing the cost resulting from its position as a self-insurer in the other triggered policy periods and seek coverage from any number of excess carriers. Moreover, allowing this type of "vertical exhaustion" would permit Gypsum to avoid pursuing any insurers who, like Transit, are in liquidation. They could merely seek coverage from solvent excess carriers.

In support of its position that "horizontal" exhaustion of all triggered primary policies is not required, Gypsum argues that each excess insurer has an independent obligation under its policy. According to Gypsum, under this independent obligation, the excess insurer must provide coverage once the underlying primary policy particular to the excess policy in question is exhausted regardless of whether the insurer has concurrent primary or excess insurance obligations. We disagree.

■ The excess policies in question contain an "other insurance" provision. The one in defendant Interstate's policy with United States' Gypsum provides:

> "If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this Policy, other than insurance that is in excess of insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance."

This clause clearly sets forth this policy's status as an excess policy. The excess policy also unequivocally sets forth that the excess insurer will not contribute "if other valid and collectible insurance with *any* other insurer is available to the insured." This supports an interpretation that this policy serves as an excess policy to all triggered primary policies, regardless of whether they extend over multiple policy periods or only one.

On point is *Continental Casualty Co. v. Armstrong World Industries, Inc.* (N.D. Ill. 1991), 776 F. Supp. 1296. There, the court applied Illinois law and policy language similar to that before us in addressing whether the insured had to exhaust all of its triggered primary coverage before seeking excess coverage. In concluding that the insured was required to exhaust all primary insurance, the court stated:

> "The Other Insurance clauses in both *** policies *** state with reasonable clarity that the coverage only begins after any

applicable primary insurance is exhausted. Neither of these clauses confine that limitation to the listed schedule of underlying primary policies. The two policies each also contain clauses defining 'ultimate net loss' for coverage purposes as excluding amounts covered by other insurance. *** The [excess] policies are both specifically designated as 'umbrella' excess policies, designed to afford coverage only when all other types of insurance are exhausted." 776 F. Supp. at 1301.

See also *Illinois Emcasco Insurance Co. v. Continental Casualty Co.* (1985), 139 Ill. App. 3d 130, 487 N.E.2d 110 (discussing the different function served by excess insurance); *Iolab Corp. v. Seabord Surety Co.* (9th Cir. 1994), 15 F.3d 1500, 1504 (Ninth Circuit, applying California law, concluded that "it is clear that '*[a]ll* primary insurance must be exhausted before liability attaches under a secondary policy.' [Citation.] Further, 'liability under [an excess] policy will not attach until *all* primary insurance is exhausted, even if the total amount of primary insurance exceeds the amount contemplated in the secondary policy.' [Citation.]" (Emphasis added)).

A plain reading of the "other insurance" provision contained in the policies requires Gypsum to exhaust all triggered primary insurance before pursuing coverage under those excess policies. Adopting Gypsum's position permitting "vertical exhaustion" would allow Gypsum to effectively manipulate the source of its recovery, avoiding difficulties encountered as the result of its purchase of fronting insurance and the liquidation of some of its insurers. This would permit Gypsum to pursue coverage from certain excess insurers at the exclusion of others. Such a practice would blur the distinction between primary and excess insurance (see *Illinois Emcasco Insurance Co.*, 139 Ill. App. 3d at 133), and would allow certain primary insurers to escape unscathed when they would otherwise bear the initial burden of providing indemnification. Likewise, certain co-excess insurers could avoid contributing to the indemnification of the insured when they would otherwise be responsible for any amount up to the limit of the policy it issued. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1986), 145 Ill. App. 3d 175, 494 N.E.2d 634, *aff'd* (1987), 118 Ill. 2d 23, 514 N.E.2d 150.) Consequently, we reject Gypsum's claim and affirm the trial court's ruling that Gypsum must exhaust all available primary coverage before proceeding against an excess carrier when that carrier's policy contains an "other insurance" clause.

For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed and remanded in part.

Judgment affirmed in part and reversed and remanded in part.

MURRAY, P.J., and McNULTY, J., concur.